No. 93,500

KENNETH E. HADDOCK, *Appellant*, v. STATE OF KANSAS, *Appellee*.

146 P.3d 187

478

Opinion
filed November 9, 2006.

*Richard Ney*, of Ney, Adams & Sylvester, of Wichita, argued the cause, and *Jessica R. Kunen*, of Lawrence, was with him on the briefs for appellant.

*Richard G. Guinn*, assistant district attorney, argued the cause, and *Steven J. Obermeier*, assistant district attorney, and *Paul J. Morrison*, district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Kenneth E. Haddock was convicted of first-degree murder, and his conviction was affirmed on direct appeal in *State v. Haddock*, 257 Kan. 964, 897 P.2d 152 (1995). In this case, he appeals the denial of his K.S.A. 60-1507 motion alleging ineffective assistance of counsel and prosecutorial misconduct and his motions for new trial based on postconviction DNA testing under K.S.A. 2005 Supp. 21-2512. This court transferred the case on its own motion pursuant to K.S.A. 20-3018. We affirm the denial of the K.S.A. 60-1507 motion and reverse and remand for further proceedings pursuant to K.S.A. 2005 Supp. 21-2512.

## Evidence at Criminal Trial

In 1993, Haddock was convicted of the first-degree murder of his wife who was found beaten to death and lying under a pile of wood in the garage of their home. His conviction was affirmed on direct appeal, where this court set forth the following relevant facts concerning the trial in this case:

"The five-day trial included over 40 witnesses and 100 exhibits. Although Haddock does not challenge the sufficiency of the evidence, a background review is helpful in understanding the issues presented.

"Haddock has a college degree in agriculture education. He moved into banking and finance, eventually serving as president of two Kansas banks. In 1986, he started his own company, First Finance, Inc., which purchased loans from the FDIC and other institutions. He described First Finance as 'very profitable.'

"Although Haddock and his three teenage children testified that their family was loving and supportive, a dark cloud loomed overhead. For two years preceding

the murder, Haddock and his family lived with uncertainty and anxiety caused by his indictment and conviction for federal bank fraud.

### "The Federal Bank Fraud Case

"In September 1990, Haddock was indicted in federal court for bank fraud and related offenses arising from transactions in 1987. A jury convicted him on 10 counts. Haddock was sentenced to 42 months' imprisonment. He remained free on bond pending appeal. On appeal, the Tenth Circuit affirmed his conviction but remanded for resentencing. *United States v. Haddock,* 956 F.2d 1534, *modified on reh'g* 961 F.2d 933 (10th Cir.), *cert. denied* [506 U.S. 828] (1992); see also *United States v. Haddock,* 12 F.3d 950 (10th Cir. 1993) (collateral claim of ineffective counsel denied; remanded for resentencing); *United States v. Haddock,* 50 F.3d 835 (10th Cir. 1995) (error found in restitution order of $76,000; remanded for recalculation of restitution). Haddock's first resentencing in the federal case was scheduled for December 18, 1992.

"Thus, on November 20, 1992, the day of the tragedy, Haddock's conviction had been affirmed and he was awaiting resentencing. Haddock's attorney met with an Assistant United States Attorney and a probation officer from 10:30 a.m. to noon that day to negotiate matters relevant to the upcoming sentencing hearing. Haddock did not attend the meeting.

"Haddock and his children admitted that the federal bank fraud case was stressful for them. In May and June of 1991, Haddock's wife, Barbara, spoke with two social workers, expressing 'anxiety' and 'anger' about the federal prosecution. However, neither social worker recalled Barbara mentioning any fear of violence from her husband. Haddock spoke with a marriage and family therapist in March 1992 about stress-related breathing problems experienced by his oldest daughter. He told the therapist that Barbara brought up the federal case 'almost any time he would get in her presence,' whereas he 'tended to shy away from talking about it' because it was a 'real hard thing to talk about.'

"Barbara's best friend, Kathy Finkleston, testified that she and Barbara often discussed the federal case and that Barbara would get very upset and emotional, 'not knowing what was going to happen or what she was going to do.' Finkleston said she believed Barbara was 'becoming very frustrated' with the expense and duration of the federal case, and that 'she was getting angry with Ken that it kept going on and on and on.' Barbara told Finkleston that the retainer alone for Ken's Washington, D.C., lawyer was $40,000, and that whenever the lawyer asked for more money he wanted at least $25,000.

### "The Hours Preceding Barbara's Death

"Barbara's last day began early. She met Finkleston for breakfast at 6:30 a.m., something the two of them did often. She and Finkleston talked about Barbara's upcoming surgery [hysterectomy], about their children, about Christmas, and then about the federal case and the meeting of attorneys scheduled for that day. Finkleston remembered that when Barbara brought up the federal case, she said, 'Oh,

my stomach just took a flip.' Barbara then said that Haddock's lawyer was wanting additional money and that Barbara was concerned that they might have to dip into a savings account they had set aside for their son's college education. Overall, however, Finkleston believed that Barbara was in 'pretty good spirits.'

"Barbara worked until around noon at her job as a triage nurse. She ran a couple of errands on her way home. Haddock went to work at First Finance from about 9:30 a.m. to 1:00 p.m., and then went home for lunch. Haddock and Barbara arrived home at the same time, around 1:20 p.m.

"According to Haddock, when he first arrived home he and Barbara brought in groceries from her car. She told him the garage door had a problem, so he worked on it for a few minutes. He then ate a light lunch as Barbara made chili for the weekend. They discussed Barbara's upcoming surgery and their younger daughter's plans to have friends over that night. Haddock said he brought in the mail at about 1:45 p.m., then started a fire in the fireplace. The last thing he said he did before leaving was to throw two articles of clothing in the hallway by the washing machine. One was a white shirt he had been wearing; the other was a pair of slacks from his bedroom. Haddock testified that the shirt was missing a button and the slacks needed to be let out in the waist, and that Barbara said she would mend them. Haddock said he left home at approximately 2:00 p.m.

### "Discovery

"At around 3:20 p.m., the youngest daughter arrived home from junior high school. Barbara's car was in the driveway and the garage door was closed. She entered through the front door, noticed some chili cooking, saw the television on, and called out for her mother. She was not concerned when she heard no reply, as nothing appeared out of the ordinary. Within minutes, the older daughter arrived home from high school.

"The daughters eventually found Barbara in the garage buried under a pile of wood. They called 911. The older daughter summoned the neighbors, the Hartleys, who were registered nurses. When the Hartleys arrived, they cleared the remaining logs off of Barbara and checked for a pulse or respiration, but found neither.

"The police arrived at 4:08 p.m. Haddock did not arrive home until 4:20 p.m. A daughter had called her father's office and left a message that he needed to come home right away. A neighbor and a police officer met Haddock at his car and escorted him inside through the front door to the living room. He embraced his daughters, who were crying. Haddock later tried to walk into the garage, but he was quickly stopped and told to stay inside the house. The police told Haddock that because his wife's death was 'unattended,' a police term meaning unattended by a physician, standard procedure required that the death be handled like a homicide until homicide could be ruled out.

### "Investigation

"Detectives at the scene quickly suspected foul play. Barbara's injuries were unlike those that might be expected from falling wood. In an autopsy, Dr. Bonita

Peterson found bruises and abrasions on Barbara's hands and arms, consistent with defensive wounds. She also observed bruises and lacerations on the face, and massive trauma to the back of the head, which she thinks resulted from 6 to 12 blows with a blunt object.

"Other evidence revealed an orchestrated crime scene. Detectives found a separate pool of blood a substantial distance from Barbara's body. Blood spatters and smears suggested that Barbara had been moved from this separate pool to the location under the wood pile. Blood was also found on Barbara's car, which was parked outside the garage. Drip patterns on the car suggested that the car had been moved after the blood was deposited. The location and nature of the blood spatter evidence on the car, when considered together with other blood spatter evidence inside the garage, suggested that the beating occurred while the car was in the garage. Tomatoes were also splattered in various places on the garage floor. Nothing was missing from the home.

"At approximately 6:00 p.m., as detectives continued searching for clues at the home, Haddock and his son accompanied Detective Larue to the Olathe Public Safety Center for questioning. In the interview, the detective observed and photographed two scratches on Haddock's right wrist that appeared fresh. Police also obtained Haddock's shoes from him at the center.

"During the evening, the detectives at the center received updated information from the crime scene suggesting that the death was not accidental. The questioning of Haddock gradually grew more pointed and accusatory until Haddock finally broke it off and was taken home. Haddock never confessed. He was arrested five days later.

"Physical evidence obtained from Haddock and from the scene played a key role in his identification as the killer. A small amount of blood was found on a shirt and pair of pants belonging to Haddock located on the floor inside the house. The shoes Haddock wore to the police center also had traces of blood on them. The blood on the clothing and shoes had DNA markings that matched Barbara's blood and excluded Haddock's blood. Blood spatter patterns were consistent with the pants and shoes being worn at the time the blood was deposited. Detectives also discovered two hairs clutched in Barbara's right hand. One hair showed DNA markings consistent with Haddock and inconsistent with Barbara, the other produced no marking.

### "The State's Theory

"The State's theory was that Haddock and Barbara were experiencing marital discord because of the federal bank fraud case, which led to a fight and then to the killing. The State argued that the 6 to 12 blows to the back of Barbara's head, some of them delivered after she was lying on the floor (according to blood spatter patterns), provided evidence of premeditation. The State asked the jury to infer that Haddock went from 'acting on impulse' to realizing that he had gone too far to turn back and thus knew 'exactly what he was doing' in administering the multiple, lethal blows. Haddock then orchestrated the garage scene in an attempt

to make the death appear accidental, hoping there would not be a rigorous investigation.

"Under the State's theory, the attack probably occurred around 2:00 p.m. because a neighbor testified that she heard a strange, muffled, sound from outside, like wood falling on concrete, shortly after 2:00 p.m. that afternoon. Although no murder weapon was conclusively established, the State introduced evidence that the fireplace poker appeared to have been wiped clean, unlike the other fireplace tools in the set and unlike how the Haddock children remembered the condition of the poker.

### "Haddock's Defense

"Haddock denied killing his wife, advancing an alibi defense. A Wendy's restaurant sack found in his van had a receipt showing a purchase at 3:18 p.m. the day of the killing. The wristwatch that Barbara was wearing, which appeared to have been broken during the attack, showed a time of 3:16 p.m. Wendy's was more than 10 minutes away from the Haddock home. Haddock testified that he left home at approximately 2:00 p.m., went to the Olathe Public Library to do research for his federal case, then to Wendy's for a burger and milkshake, then out to look at some property for a possible investment purchase by his company, and then back to the office, where he was immediately told by his secretary to go home.

"As for the DNA evidence obtained from his shoes and the clothes found inside the house, Haddock argued that Barbara's blood could have been transferred to his shoes when he embraced his daughters, who carried their mother's blood from their attempts to help her. He advanced a similar theory (the daughters rushing back and forth from garage to the 911 call) to explain Barbara's blood on his clothes found lying on the floor near the laundry room.

"The State attacked his alibi. The two front desk clerks at the Olathe Public Library who worked that Friday afternoon testified that it was a 'slow afternoon' and that they did not remember seeing Haddock or anyone resembling Haddock in the library. The State introduced evidence of a watchmaker who examined and tested Barbara's watch. He determined that the hands could have been manipulated to show any time after it had been broken. The State argued that the watch was part of the orchestrated crime scene." *Haddock*, 257 Kan. at 965-71.

## Haddock's Relevant Posttrial Motions

On April 23, 1997, Haddock filed a K.S.A. 60-1507 motion alleging ineffective assistance of trial and appellate counsel, prosecutorial misconduct, and judicial abuse of discretion. On November 6, 1997, Haddock filed a pro se motion to dismiss judgment of conviction alleging among many other claims that the prosecutor failed to disclose exculpatory evidence that pointed to a third-party

killer and offered false DNA testimony through its DNA expert, the Laboratory Director of GeneScreen, Dr. Robert C. Giles. On November 20, 2000, Haddock filed a motion for production of evidence for DNA testing requesting that the two hairs found in the victim's right hand, eyeglasses found at the scene, and fingernail scrapings from the victim be submitted for further DNA testing.

A hearing on the motion for production of evidence for DNA testing was held on January 19, 2001. Dr. Dean Stetler reviewed a partial trial transcript of Dr. Giles' testimony and the August 13, 1993, GeneScreen lab report concerning the DNA analysis that had been performed in the case. The 1993 GeneScreen report identified the existence of three DQ Alpha types (also referred to as alleles or genotypes) in the hair of the right hand of the victim (faint 1.1, 1.2, 4). However, the report also provided in relevant part:

"In addition, specimen FOR1519-3639 (hair) typed as a 1.1/4. *Due to the presence of the 1.¼ DQ alpha type and the nature of the testing procedure, it is not possible to determine if a 1.2 type may also be present.* The 1.¼ type matches specimen FOR1519-3351 (blood -K. Haddock) which also typed as 1.¼.

"The frequency of the DQ 1.¼ alpha type in three North American populations is as follows:

| | |
|---|---|
| "Blacks | 9.1% |
| "Caucasians | 7.4% |
| "Hispanics | 5.9% |

. . . .

"Every individual has two copies of DNA, and therefore has two genotypes. The genotypes determined for each specimen are shown above. If a specimen has only one genotype detected, then that specimen is presumed to be homozygous, meaning both copies of DNA have the same genotype.

"A specimen with more than two indicated genotypes is a mixed specimen coming from more than one person." (Emphasis added.)

At trial, Dr. Giles testified that the typing they achieved on the hair was 1.¼, which was "consistent with the blood of Mr. Haddock and is inconsistent with the blood of Mrs. Haddock." On cross-examination, Dr. Giles admitted that is was not possible to determine if a 1.2 DQ Alpha type, such as from the victim, was also present in the hair sample.

After reviewing this report and transcript, with regard to the hair found in the victim's hand, Dr. Stetler testified that the DQ alpha analysis report showed the presence of a weak 1.1 allele, a possible 1.2 allele, and a 4 allele. Each individual has at least one allele but no more than two alleles; the victim was a type 1.1, 1.2, and Haddock was a 1.¼. Dr. Stetler opined that it was significant the 1.1 allele was weak because if both alleles came from the same person, they would be expected to be the same. Dr. Stetler testified that it was unlikely, based on the report, that the hair came solely from Haddock or from a mixture of Haddock and the victim's hair, but it was possible that the hair had come from a mixture of the victim's hair with a third party or a mixture of the hair of Haddock, the victim, and a third party.

Dr. Stetler opined that Dr. Giles' testimony at trial that the hair was inconsistent with the victim and consistent with Haddock was inaccurate or misleading. It was just as likely that the hair came from the victim as it was from Haddock, and only part of the contribution could have been made by Haddock as demonstrated by the presence of the 1.2 allele. Based on the DNA testing used at trial (polymerase chain reaction -PCR), the percentage of the population having Haddock's Alpha type (1.¼) was 6% to 7%. Dr. Stetler suggested that the more advanced and discriminating Short Tandem Repeat (STR) DNA testing be performed which could pinpoint the DNA to one in several quadrillion.

State's witness Johnson County Criminalistics Laboratory Director and forensic scientist Gary Dirks testified that he was involved in requesting GeneScreen to conduct the DNA testing in 1992 and 1993. Dirks opined that GeneScreen was and remained a representable DNA laboratory. Dirks reviewed the 1993 GeneScreen report generated by Dr. Giles. He acknowledged on cross-examination that the hair would be consistent with the victim's genotype (1.1, 1.2) or a third party with a genotype (1.2, 4) and that further testing could answer some of the questions raised by Dr. Stetler.

In a March 30, 2001, memorandum and order, the district court denied Haddock's K.S.A. 60-1507 motion and his motion for additional DNA testing. The district court relied primarily upon *Mebane v. State*, 21 Kan. App. 2d 533, 902 P.2d 494, *rev. denied* 258

Kan. 859 (1995), in concluding that Haddock had "failed to demonstrate that he would be exonerated of the murder conviction should the DNA evidence be tested as requested." The court found that trial counsel was not ineffective for failing to obtain independent DNA testing because the reasons may have been tactical as in *Sanders v. State*, 26 Kan. App. 2d 826, 995 P.2d 397 (1999), *rev. denied* 269 Kan. 934 (2000). Additionally, the court concluded that it need not reach the issues of prosecutorial misconduct or abuse of discretion, as those issues were found to be without merit on direct appeal.

On April 9, 2001, Haddock filed a "Motion, Pursuant to K.S.A. 60-252(b), to Amend Findings and to Make Additional Findings; Objection to Court's Findings and Conclusions." Haddock argued in part that the district court had failed to consider all of the ineffective assistance of counsel and prosecutorial misconduct issues raised in the K.S.A. 60-1507 motion and motion for DNA testing and asked the court for another hearing and to reconsider its previous rulings.

On May 18, 2001, Haddock filed a "Supplemental Briefing in Support of Post-Trial Motions and Request for DNA Testing," citing *Harvey v. Horan*, 2001 WL 419142 (E.D. Va., unpublished opinion filed April 16, 2001), *rev'd* 278 F.3d 370 (4th Cir.), *reh. denied* 285 F.3d 298 (4th Cir. 2002). On July 19, 2001, Haddock filed a "Second Supplement to Post-Trial Motions and DNA Testing Request; Petition for DNA Testing Pursuant to House Bill 2176." This motion referred to K.S.A. 2005 Supp. 21-2512, which became effective on July 1, 2001. Haddock argued he would be entitled to a new trial if the hair in the victim's hand, the glasses found at the crime scene, or the fingernail scrapings contained a third party's DNA or was different from the trial testimony.

On July 31, 2001, the parties filed a joint agreement to allow DNA testing of the hair, the victim's fingernail scrapings, and the glasses. The parties agreed that the testing would be accomplished by Dr. Brian Wraxall, Chief Forensic Serologist of the Serological Research Institute of Richmond, California, who was selected by Haddock. On August 27, 2001, the court ordered DNA testing on

these items and the taking of a blood sample from Haddock for comparison purposes.

On April 10, 2002, Haddock filed a "Motion to Dismiss" arguing the DNA testing showed that the hair in the victim's hand came from a third party contrary to the State's expert's testimony at trial. Additionally, Haddock argued that a reanalysis of a typing strip obtained from GeneScreen revealed that blood on Haddock's shoe was consistent with his own blood rather than that of the victim, contrary to the expert testimony at trial. He reasserted that trial counsel was ineffective for failing to conduct a serious investigation into the State's DNA evidence.

On July 31, 2002, the State filed a response to the motion to dismiss in which it argued in part that the defense had failed to comply with the parties' agreement regarding which three items were to be tested and improperly obtained the PCR typing strips generated from earlier testings by GeneScreen concerning the blood on Haddock's shoes.

On August 7, 2002, an evidentiary hearing was held on Haddock's request for further DNA testing, the 60-1507 motion, and the motion to dismiss. Dr. Wraxall testified that the hair had been subjected to STR analysis, which was much more discriminatory than the HLADQ alpha system initially reported by GeneScreen; STR analysis determined that the hair was from a female that was not consistent with the victim. The hair also had a fair amount of cellular debris which was consistent with the hair being pulled out of the head. Dr. Wraxall concluded that the DNA of the fingernail scrapings was that of the victim and there was no indication of any other source of the DNA. The DNA on the eyeglasses was also consistent with that of the victim; however, there was extraneous DNA on the glasses, possibly from a male source, but not consistent with Haddock.

The district court would not let Haddock elicit testimony regarding Dr. Wraxall's analysis of the GeneScreen DQ Alpha typing strips regarding the blood on Haddock's shoes because it was outside the scope of the court's jurisdiction as it was not one of the three items agreed to be tested in the motion for additional testing. Additionally, the court found that its relation to the ineffective

assistance of counsel claims was not a basis to retry all of the issues and facts of the case. The defense did proffer that Dr. Wraxall would testify that the DNA profile on one spot of Haddock's shoe was from a person with the same profile as Haddock and that the DNA on the pants did not match the DNA found on the shoes, although the State produced evidence at trial that the DNA on both the pants and the shoes belonged to the victim. Dr. Wraxall recommended that further, more discriminatory PCR DNA testing be performed on the bloodstains on the shoes and other pieces of evidence at the crime scene.

At the conclusion of the hearing, the district court found that overwhelming evidence of Haddock's guilt was presented at trial and Haddock had not "met his burden of showing there is a substantial question of innocence in this case." The court found the Kansas Supreme Court had addressed the issues of prosecutorial misconduct on direct appeal, but the court clarified that it did not find any evidence of prosecutorial misconduct in this case.

Although defense counsel suggested that the court had not addressed all of the ineffective assistance of counsel claims and it had moved for reconsideration, the court found that it had previously addressed the issue of ineffective assistance of counsel in detail in the 60-1507 motion. Defense counsel could not specify to the court which issues it was referring to at the hearing. The court ruled that it was denying the 60-1507 motion in its entirety, reasoning that the remaining issues concerning the competency of Dr. Bonita J. Peterson, chain of custody of evidence, and Haddock's alibi defenses were all matters that should have been addressed on direct appeal and that movant was attempting to retry the case under the guise of a 60-1507 motion. However, the court also granted defense counsel's request to file a motion seeking further testing on the shoes and clothing.

On August 19, 2002, the defense filed a "Motion for DNA Testing of Shoes, Pants, and Shirt." On October 31, 2002, Haddock filed a pro se "Motion for Partial Summary Judgement on the 'Motion for DNA Testing of Shoes, Pants, and Shirt' Portion of the Discovery Request/Motion filed August 19, 2002 under K.S.A. 21-2512." Haddock argued he was forced to file the motion pro se

because his out-of-state attorney was not responding to his letters or calls. Attached to the motion was an affidavit from Judith Floyd, forensic manager of GeneScreen, providing that the DNA in question on the shoe was most likely a mixture of two types of DNA (rather than just the victim's DNA as was presented at trial) and recommended that additional STR DNA analysis be performed to resolve the ambiguity presented by the typing strip.

On November 22, 2002, defense counsel withdrew from the case, and Haddock was permitted to proceed pro se. On December 3, 2002, the district court filed an "Order Denying Petitioner's Motion to Dismiss" journalizing its rulings from the August 7, 2002 hearing. On January 8, 2003, Haddock filed a motion to dismiss the December 3, 2002 order. On January 30, 2003, a hearing was held on Haddock's motion for additional testing of the shoes, shirt, and pants and on his motion to dismiss (which was construed by the court as a motion for reconsideration). The State stipulated that it was willing to submit the items for further testing to the Laboratory Corporation of America (Lab Corp.). However, Haddock wanted the testing performed by Dr. Wraxall. Nevertheless, the district court directed that the Johnson County Criminalistics Lab direct Lab Corp. to do the testing and report the results to the court.

On February 18, 2003, the district court issued an order denying Haddock's motion for reconsideration; granting Haddock's motion for additional DNA testing on Haddock's shoes, shirt, and pants; denying the motion to subpoena the prosecutor as a witness for the defense; and denying his motion for an accident reconstructionist. The March 21, 2003, Lab Corp. report found that the testing of the cuff area of the shirt failed to reveal the presence of blood, that an attempt to develop a DNA profile from the cuff area of the shirt and the extracted DNA from the shoe failed to yield results due to insufficient quantities of DNA, and the DNA extract from the slacks was consistent with coming from a female source.

On June 25, 2003, Haddock filed a pro se request for admissions "for purposes of the pending K.S.A. 60-1507, which is awaiting a final hearing on Lab Corp's DNA test results (which now incorporates K.S.A. 21-2512) for the truth of any matters within the

scope of K.S.A. 60-226." On July 25, 2003, the State filed a response to this request suggesting in part that Lab Corp. perform an additional process where the remaining shoe extract could be concentrated which would enhance the chances of obtaining a DNA profile. However, Haddock objected to this process because it would require the complete consumption of the remaining extract.

On August 29, 2003, Haddock filed a petition for mandamus and immediate restraining order with the Kansas Supreme Court requesting that the court take over jurisdiction of the case and provide immediate relief. The petition and motion for rehearing were denied by this court on September 23, 2003, and November 12, 2003.

On July 23, 2004, Haddock, through current counsel, filed a "Motion for Final Decision Pursuant to K.S.A. § 60-254" requesting that a final order resolving all issues presented to the district court be filed so that he could file an appeal with the Court of Appeals. The motion argued that the Lab Corp. report and the results contained therein must be considered by the district court in the context of the entire proceeding or controversy in combination with all of the claims previously raised by Haddock.

On October 25, 2004, the district court issued an order denying Haddock's motion. The court found that it had issued orders ruling upon or otherwise addressing the issues raised in each motion between April 1997 and November 2003. The court found that arguably the only remaining issue before the court was the motion for additional DNA testing on the shoes, shirt, and pants; however, Haddock's refusal to agree to further testing/consumption by Lab Corp. results in the fact that the lab cannot proceed and thus there were no substantive issues regarding the most recent DNA testing before the court. The court found that "K.S.A. 60-254 is both inapplicable to Mr. Haddock's request, and ineffective to resurrect jurisdiction over the Court's previous rulings."

On November 4, 2004, Haddock filed a notice of appeal from all adverse rulings prior to and including the final ruling by the district court on October 25, 2004. The case was subsequently

transferred to this court by its own motion pursuant to K.S.A. 20-3018(c).

On February 25, 2005, the parties stipulated that a January 19, 2005, letter from Assistant Attorney General Jane E. Nohr to the prosecution and a 3-page response, generated by the Kansas Bureau of Investigation (KBI) Biology Supervisor Sindey Schueler, to questions presented by Haddock in a December 12, 2003, letter regarding the DNA evidence should be added to the record. The parties stipulated that the KBI response was generated while the case was pending and was not presented to Haddock until after his appeal was docketed. The letter provided:

"We are in receipt of Richard Ney's letter dated January 10, 2005 requesting the KBI's opinion on DNA testing. We received [Haddock's] letter dated December 12, 2003, with limited information provided. Our Biology Supervisor Sindey Schueler was reluctant to respond since she had not been provided all of the DNA files, notes and other relevant laboratory information. We were only being provided what [Haddock] thought was important or relevant in his letter. As a matter of practice, our laboratory does not provide expert opinions on evidence it has not examined. If the court wants us to review the evidence, that is entirely a different matter.

"Ms. Schueler did generate a response as to the questions asked by [Haddock]. This response was generated for internal purposes and was not intended to be distributed to [Haddock] or others outside of the KBI. The response was written only based upon the written information provided by the defendant as we are not aware of all the facts involved with this particular case. These responses might change if provided with the complete laboratory file.

"Please provide this information to the defense should you feel the information is exculpatory."

The KBI report included answers to questions asked by Haddock but did not include the questions themselves. The report did include an opinion on the relevant items which will be discussed in our analysis below.

## POSTCONVICTION DNA TESTING

Haddock argues that his conviction should be vacated and he should be granted a new trial because postconviction DNA testing proved that false DNA evidence was introduced at his trial. Under the umbrella of this issue, Haddock argues he is entitled to a new trial because: (1) favorable exculpatory DNA evidence was estab-

lished under K.S.A. 2005 Supp. 21-2512, requiring a new trial; (2) his conviction was based upon false evidence put on by the State through its DNA expert at trial, Dr. Giles; and (3) exculpatory DNA evidence was withheld by Dr. Giles at the same time the false evidence was introduced into evidence.

As a preliminary matter, we first consider whether some of the DNA evidence relied upon by Haddock in support of this issue was presented to the district court and should be considered by this court on appeal. See *Volt Delta Resources, Inc. v. Devine,* 241 Kan. 775, 782, 740 P.2d 1089 (1987) ("Evidence not presented to the trial court will not be considered for the first time on appeal."). The State takes issue specifically with three items: (1) April 15, 2002, affidavit of GeneScreen Analyst Judith Floyd; (2) March 25, 2002, affidavit of Dr. Brian Wraxall regarding DNA typing of blood on shoes and corresponding proffer of this evidence; and (3) 2004 Report of KBI Biology Supervisor Sindey Schueler.

The State first urges the court not to consider the Floyd affidavit because it was not admitted into evidence. While this is true, it was attached to Haddock's October 31, 2002, motion regarding DNA testing of the shoes, pants, and shirt; the defense referred to it at the January 30, 2003, oral argument; and it was seemingly considered by the district court in denying Haddock's motion to reconsider. As such, we will consider it on appeal.

Second, the State points out that the district court refused to consider Dr. Wraxall's affidavit and corresponding testimony concerning his review of the GeneScreen typing strips regarding the blood on the shoes at the August 7, 2002, hearing because it constituted unfair surprise and, at the time, the parties had only agreed to additional testing on the hair, glasses, and fingernail scrapings. Haddock responds that it would be unconstitutional for this court to turn a blind eye to this exculpatory evidence which demonstrates that his conviction rests on false evidence.

It is important to note that although numerous motions have been filed in this case over the years, and many of them are interrelated, the key proceedings to this case are the initial 60-1507 proceeding (and corresponding motion for DNA testing *pre*-K.S.A. 2005 Supp. 21-2512); the motion for additional DNA testing of the

hair, glasses, and fingernails under K.S.A. 2005 Supp. 21-2512; and the subsequent motion for DNA testing of the shoes, pants, and shirt under K.S.A. 2005 Supp. 21-2512. The district court refused to consider Dr. Wraxall's review of the shoe evidence in the context of first motion under K.S.A. 2005 Supp. 21-2512 because such a review was not authorized by the court. However, in the context of the subsequent motion for additional DNA testing of the shoes, this evidence was relevant, and it was referred to in the October 31, 2002, motion concerning this additional DNA testing under K.S.A. 2005 Supp. 21-2512. As such, we will consider this affidavit on appeal.

Finally, the State argues that the 2004 KBI report was neither presented to nor considered by the district court. Haddock argues that the stipulation by the parties provides that the report was generated while the case was pending and had he been informed of the exculpatory report pursuant to *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), it would have been presented to the district court. It is undisputed that this evidence was not considered by the district court in this case, nor was Haddock given an opportunity to request a motion to reconsider because the district court no longer had jurisdiction once the appeal was docketed. See *ARY Jewelers v. Krigel*, 277 Kan. 464, 473, 85 P.3d 1151 (2004) (" 'A trial court does not have jurisdiction to modify a judgment after it has been appealed and the appeal docketed at the appellate level.' ").

However, Haddock bears some responsibility for never receiving this report. The January 19, 2005, letter from the KBI indicates that although Haddock sent the KBI a list of questions concerning his DNA testing in December 2003, defense counsel did not request the response to this letter until January 10, 2005, nearly 2 years later and 2 months after the notice of appeal was filed in this case. Moreover, it is especially important that this report be considered by a factfinder because the report was prepared for internal use only, answers questions posed by Haddock which are not included in the report, utilizes only the information provided by Haddock, and clearly states that the KBI's opinions might change if it was privy to all of the facts and evidence of the case. As this report

was never considered by the district court, we will not consider it on appeal. See *Volt Delta Resources*, 241 Kan. at 782 ("Evidence not presented to the trial court will not be considered for the first time on appeal.").

## K.S.A. 2005 Supp. 21-2512

The issues raised in Haddock's first motion for additional DNA testing under 21-2512 and also under his second motion for additional DNA testing under 21-2512 are issues of first impression in this state. As such, we must analyze the provisions of K.S.A. 2005 Supp. 21-2512. Our legislature passed House Bill 2176 in 2001, which became effective on July 1, 2001, and is codified as K.S.A. 2005 Supp. 21-2512. It is important to note that Haddock had filed a motion for additional DNA testing prior to the effective date of K.S.A. 2005 Supp. 21-2512, which motion was denied by the trial court under the standard which existed prior to the existence of the above statute. See *Mebane*, 21 Kan. App. 2d 533.

The provisions of K.S.A. 2005 Supp. 21-2512 are quite different in substance and procedure from our former standard. K.S.A. 2005 Supp. 21-2512 provides:

"(a) Notwithstanding any other provision of law, a person in state custody, at any time after conviction for murder as defined by K.S.A. 21-3401, and amendments thereto, or for rape as defined by K.S.A. 21-3502, and amendments thereto, may petition the court that entered the judgment for forensic DNA testing (deoxyribonucleic acid testing) of any biological material that:

(1) Is related to the investigation or prosecution that resulted in the conviction;

(2) is in the actual or constructive possession of the state; and

(3) was not previously subjected to DNA testing, or can be subjected to retesting with new DNA techniques that provide a reasonable likelihood of more accurate and probative results.

"(b)(1) The court shall notify the prosecuting attorney of a petition made under subsection (a) and shall afford the prosecuting attorney an opportunity to respond.

(2) Upon receiving notice of a petition made under subsection (a), the prosecuting attorney shall take such steps as are necessary to ensure that any remaining biological material that was secured in connection with the case is preserved pending the completion of proceedings under this section.

"(c) The court shall order DNA testing pursuant to a petition made under subsection (a) upon a determination that testing may produce noncumulative, exculpatory evidence relevant to the claim of the petitioner that the petitioner was wrongfully convicted or sentenced.

"(d) The cost of DNA testing ordered under subsection (c) shall be borne by the state or the petitioner, as the court may order in the interests of justice, if it is shown that the petitioner is not indigent and possesses the means to pay.

"(e) The court may at any time appoint counsel for an indigent applicant under this section.

"(f)(1) If the results of DNA testing conducted under this section are unfavorable to the petitioner, the court:

(A) Shall dismiss the petition; and

(B) in the case of a petitioner who is not indigent, may assess the petitioner for the cost of such testing.

(2) If the results of DNA testing conducted under this section are favorable to the petitioner, the court shall:

(A) Order a hearing, notwithstanding any provision of law that would bar such a hearing; and

(B) enter any order that serves the interests of justice, including, but not limited to, an order:

(i) Vacating and setting aside the judgment;

(ii) discharging the petitioner if the petitioner is in custody;

(iii) resentencing the petitioner; or

(iv) granting a new trial.

(3) If the results of DNA testing conducted under this section are inconclusive, the court may order a hearing to determine whether there is a substantial question of innocence. If the petitioner proves by a preponderance of the evidence that there is a substantial question of innocence, the court shall proceed as provided in subsection (f)(2).

"(g) Nothing in this section shall be construed to limit the circumstances under which a person may obtain DNA testing or other postconviction relief under any other provision of law."

Before applying the provisions of the statute to the case we now consider, some comment on its substantive and procedural aspects are warranted. Because of its scientific precision and reliability, DNA testing can in some cases conclusively establish guilt or innocence of a defendant. In other cases, DNA may not conclusively establish guilt or innocence but may have significant probative value to a finder of fact. See *State v. Buckman*, 267 Neb. 505, 515-16, 675 N.W.2d 372 (2004). K.S.A. 2005 Supp. 21-2512 provides for certain mandatory dispositions and procedural requirements depending upon the results of the additional DNA testing. There are three possible results: (1) unfavorable, (2) favorable, and (3) inconclusive.

### 1. Unfavorable Results

If the additional DNA testing is unfavorable to the defendant, the court *shall* dismiss the petition and make an appropriate order for the assessment of cost for such testing. See K.S.A. 2005 Supp. 21-2512(f)(1)(A) and (B).

### 2. Favorable Results

DNA testing favorable to the defendant requires the court to ("the court shall") hold a hearing notwithstanding any provisions of the law that would bar a hearing. Any time requirements barring consideration of this motion, including the time requirements for a motion for relief from judgment or motion for new trial, have no application. The provisions of the statute contemplate a full due process hearing with notice to all parties and with an opportunity to be heard in a meaningful manner. See K.S.A. 2005 Supp. 21-2512(b)(1), (e), and (f)(2) (governing notice to and response of prosecutor, appointment of counsel for an indigent defendant, and order for hearing). After the hearing, the court *shall* enter *any order that serves the interests of justice*, including, but not limited to, an order: vacating and setting aside the judgment; discharging the petitioner if the petitioner is in custody; resentencing the petitioner; or granting a new trial. See K.S.A. 2005 Supp. 21-2512(f)(2)(B)(i), (ii), (iii), and (iv).

Any order entered should be accompanied by the court's findings of fact and its conclusions of law on all relevant, contested issues addressed at the hearing so that appropriate appellate review may be had should an appeal from such order be perfected. The legislature has provided for any order to be entered that serves the interests of justice, including orders which may dispose of the pending case before the court. The law does not provide detailed guidelines as to when dispositive orders are required to be issued in particular cases, nor is detailed guidance given as to what orders may be entered that would serve the interests of justice. However, the law in this state provides ample guidance for district courts as to what orders may be appropriate in the particular circumstances of the case before it. Since this is a new law, we provide some comment on possible or probable dispositions available. However,

we note that in the final analysis, each decision must be based upon its peculiar facts and the trial court's sound discretion granted in K.S.A. 2005 Supp. 21-2512.

a)   Any Order that Serves the Interests of Justice

We make no comment concerning the provision of the law which provides that the district court shall enter *any order that serves the interests of justice*. Under this provision the legislature has truly granted the district court wide discretion in the orders it may enter in its decision to serve the interests of justice. Since the grant is almost limitless consistent with the interests of justice and dependent upon the peculiar facts of the case being heard, it becomes difficult to posit either orders that may be entered or under what circumstances such orders are entered. We leave this matter to the sound discretion of the trial court and, upon review, would only reverse if the court's exercise of such discretion constitutes an abuse of that discretion.

b)   Vacating and Setting Aside the Judgment/Discharging the Petitioner

As indicated above, because of its scientific precision and reliability, DNA testing in some instances may conclusively establish the guilt or innocence of a criminal defendant. When such testing, based upon hearing, establishes the innocence of a criminal defendant, the court should enter an order vacating and setting aside the judgment of conviction and enter an order discharging the petitioner if the petitioner is in custody. Before such orders are entered, the hearing judge must consider the favorable results with the evidence of the case which resulted in the underlying judgment. The court must then determine that guilt cannot be sustained because the new evidence completely exonerates the defendant or upon consideration of all the evidence, the evidence of the new DNA results is so highly exculpatory so as to show a complete lack of evidence to establish that a rational juror based upon all evidence could not fairly find the defendant guilty beyond a reasonable doubt. Stated another way, in light of the favorable results, the evidence establishing the guilt of the defendant is doubt-

ful in character and completely lacking in probative value with the result that a rational factfinder could not fairly find the defendant guilty beyond a reasonable doubt.

We note that if the district court rules against the defendant on this issue, the defendant may appeal this order under K.S.A. 2005 Supp. 22-3602(a) ("an appeal to the appellate court having jurisdiction of the appeal may be taken by the defendant as a matter of right from any judgment against the defendant in the district court"). However, in contrast, if the district court rules in favor of the defendant and vacates and sets aside the conviction, the State may not appeal this order. See K.S.A. 2005 Supp. 22-3602(b) (prosecution may appeal as a matter of right from "order dismissing a complaint, information or indictment"; "from an order arresting judgment"; "upon a question reserved by the prosecution"; or "upon an order granting a new trial in any case involving a class A or B felony or for crimes committed on or after July 1, 1993, in any case involving an off-grid crime," and no others).

### c) Resentencing the Petitioner

This order calls for vacating defendant's sentence and remanding for resentencing. What has been said above with reference to vacating and setting aside the judgment would also apply to this order. It assumes that an order vacating and setting aside the judgment has been entered based upon the new DNA testing but that defendant had also been charged and convicted with other crimes which have not been affected by the new DNA evidence. In such situations, the case would have to be remanded for imposition of another sentence without the convictions vacated by the new DNA evidence.

### d) Granting a New Trial

In almost all cases where the new DNA evidence is favorable, except in those cases where the court after hearing has entered any other order to serve the interests of justice, the hearing judge is faced with a decision of whether to grant a new trial based upon the favorable results from the new DNA testing.

The standard for whether to grant a new trial under such circumstances is similar to our standard for granting a new trial based upon newly discovered evidence, except that no time limit exists for such a motion and a defendant need not establish that the new evidence was newly discovered. In all other respects it is treated as a motion for new trial governed by the provisions of K.S.A. 22-3501: "The court on motion of a defendant may grant a new trial to him if required in the interest of justice."

Just as the court *"shall enter any order that serves the interests of justice"* under the provisions of K.S.A. 2005 Supp. 21-2512, one such order "in the interest of justice" is an order for a new trial. In order to grant such an order, the "evidence must be of such materiality that a reasonable probability exists that it would result in a different outcome at trial. [Citation omitted.]" *State v. Henry*, 263 Kan. 118, 132-33, 947 P.2d 1020 (1997). We additionally note that just as an order granting a new trial under K.S.A. 22-3501(1) is subject to an abuse of discretion, the standard of appellate review of a trial court's order under K.S.A. 2005 Supp. 21-2512 is whether the trial court abused its discretion. See *State v. Adams*, 280 Kan. 494, 501, 124 P.3d 19 (2005).

3. Inconclusive Results

The first point that must be noticed about this provision of the statute is that unlike the mandatory hearing required upon favorable results, the district court is granted discretion in ordering a hearing when the DNA results are inconclusive. If the court orders a hearing, its purpose is for the court to determine whether there is a substantial question of innocence. In such a hearing, the defendant has the burden to prove by a preponderance of the evidence "that there is a substantial question of innocence." See K.S.A. 2005 Supp. 21-2512(f)(3).

If the defendant meets such a burden, the court shall proceed as provided in K.S.A. 2005 Supp. 21-2512(f)(2); that is, the court shall:

"enter any order that serves the interests of justice, including, but not limited to, an order:
(i) Vacating and setting aside the judgment;

(ii) discharging the petitioner if the petitioner is in custody;
(iii) resentencing the petitioner; or
(iv) granting a new trial."

Haddock argues that the district court's conclusion that the postconviction DNA test results were inconclusive was wrong. He contends the evidence clearly and conclusively excluded him as the source of the hair found in the victim's hand and proved that the DNA on his shoes did not match the victim's DNA, that the DNA on Haddock's pants did not match the DNA on his shoes, that there was no evidence of the presence of blood on his shirt, and that there was no male DNA present in the victim's fingernail scrapings, contrary to the evidence presented at trial.

It is important to recall that this case involves two separate motions under K.S.A. 2005 Supp. 21-2512 concerning two different sets of evidence. The first motion concerned testing of the hair, the glasses, and the fingernail scrapings. The second motion concerned testing of the shoes, slacks, and shirt.

At the August 7, 2002, hearing on the first motion and Haddock's motion to dismiss based on the testing, subsequent DNA testing revealed that the hair was from a female other than the victim, that the fingernail scrapings contained the victim's DNA, and that the glasses contained DNA consistent with the victim and additional DNA which gave some indication as being male, but was inconsistent with Haddock. The district court at least implicitly concluded that the above evidence was inconclusive and that defendant had not met his burden of showing by a preponderance of evidence that "a substantial question of innocence" based upon overwhelming evidence of his guilt at trial existed. Thus, the district court affirmed the above conclusion in denying defendant's motion for reconsideration.

It is clear to this court that the district court in resolving defendant's first motion implicitly reached the wrong conclusion that the DNA evidence subject to the first motion was "inconclusive." The postconviction DNA testing clearly established that the hair in the victim's hand was consistent with a third-party female rather than Haddock as suggested by Dr. Giles at trial. The fingernail scrapings, tested indicated a DNA consistent with the victim's

DNA profile rather than Haddock's, and the eyeglasses contained both the victim's DNA and extraneous DNA from another source, possibly male, but inconsistent with Haddock. There can be no question that these results under law are favorable, and the district court erred in its application of the provisions of K.S.A. 2005 Supp. 21-2512(f)(3). Instead, the district court should have applied the provisions of K.S.A. 2005 Supp. 21-2512(f)(2). In this respect, the district court erred and its decision regarding the first motion filed by the defendant under K.S.A. 2005 Supp. 21-2512 must be reversed and the case remanded for further consideration of the defendant's first motion.

The district court's finding that the results were "inconclusive" may have been based on a theory that the results had to either conclusively exonerate the defendant or they were considered inconclusive. However, as discussed above, DNA results need not be completely exonerating in order to be considered favorable. See *Buckman*, 267 Neb. at 515-16 (DNA may not conclusively establish guilt or innocence but may have significant probative value to a finder of fact).

*People v. Dodds*, 344 Ill. App. 3d 513, 801 N.E.2d 63 (2003), provides further guidance on this issue. In that case, postconviction DNA testing showed that blood on the defendant's clothing did not match the victim's DNA. The court described this as a negative or non-match results which were favorable in part: "Negative or non-match results are those, as in the instant case, where the results show that the victim was not the source of a certain sample (defendant's clothing here), but which results do not necessarily exclude the defendant as the perpetrator." 344 Ill. App. 3d at 518 n.2. The court found that "once DNA testing is ordered and the results are favorable, at least in part, to a defendant, such as where a non-match is revealed, an evidentiary hearing is necessary to determine the legal significance of the results because such results would make a substantial showing of a constitutional violation." 344 Ill. App. 3d at 522.

In this case, the results of the hair, fingernail, and eyeglasses testing, while not conclusively establishing Haddock's innocence, were favorable in part in that they supplied a favorable inference

that someone other than Haddock could have committed the murder. See *Dodds*, 344 Ill. App. 3d at 523 ("the non-match for DNA evidence of the bloodstains on defendant's clothing could have supplied a favorable inference of defendant's innocence"). As the testing results under defendant's first motion were favorable, the district court was required to conduct a hearing under K.S.A. 2005 Supp. 21-2512(f)(2).

Although a hearing on the results was held in this case, the hearing was conducted pursuant to K.S.A. 2005 Supp. 21-2512(f)(3), where Haddock had the burden to establish a substantial question of innocence before one of the remedies under subsection (f)(2) could be applied. As the district court placed an unnecessary burden on Haddock, we must remand and order that a new hearing be conducted regarding the favorable results pursuant to K.S.A. 2005 Supp. 21-2512(f)(2). As the favorable DNA results in this case are not conclusively exonerating, the district court must determine whether to order a new trial, or, in its discretion, enter some other order in the interests of justice. As discussed above, in considering whether to grant a new trial based on this favorable evidence, the district court must consider whether the "evidence . . . [is] of such materiality that a reasonable probability exists that it would result in a different outcome at trial. [Citation omitted.]" *Henry*, 263 Kan. at 132-33.

With reference to defendant's second motion for DNA testing concerning the shoes, shirt, and slacks, the court ordered additional testing to be performed by Lab Corp. in a February 18, 2003, order. The results of this testing indicated that the cuff area of the shirt failed to reveal the presence of blood, that an attempt to develop a DNA profile from the cuff area of the shirt and the extracted DNA from the shoe failed to yield results due to insufficient quantities of DNA, and that the DNA extract from the slacks was consistent with coming from a female source.

Contrary to Haddock's assertion in his brief on appeal, the district court never made a finding that this evidence from the second motion was inconclusive under K.S.A. 2005 Supp. 21-2512. Rather, in response to Haddock's motion for final decision pursuant to K.S.A. 60-254, the court found that as a result of Haddock's refusal

to submit to further DNA testing by Lab Corp., no substantive issues regarding the most recent DNA testing were before the court. We conclude that the district court's resolution of the second motion for DNA testing is also in error and must be reversed and remanded for further consideration by the district court.

On remand with reference to the defendant's second motion for DNA testing, the district court must enter a final order concerning the effect of the Lab Corp. results on the shoes, shirt, and slacks. As the record now stands, the evidence regarding the slacks is unfavorable to Haddock because the evidence at trial established the blood on the slacks belonged to the victim. At the same time, when evidence of additional testing on the shoes and shirt are added to the mix, the court will have to make a determination as to whether the mix is favorable, unfavorable, or inconclusive.

In many respects, the end result may depend upon Haddock. If Haddock chooses to proceed with further DNA testing on the shoes and shirt, then the courts would be in a position to evaluate whether the results of such tests are favorable, unfavorable, or inconclusive. If the results are favorable, then the district court must consider the results at the hearing with the favorable results under the first motion and enter any order consistent with the interests of justice as set forth in K.S.A. 2005 Supp. 21-2512(f)(2) and (3). However, if Haddock chooses not to go forward with further DNA testing on the shoes and shirt, the court must determine on the basis of the evidence before it whether such results are favorable, unfavorable, or inconclusive and apply the appropriate provisions of K.S.A. 2005 Supp. 21-2512(f)(2) or (3).

In conclusion, the DNA results under the first motion concerning the fingernails, hair, and eyeglasses were favorable rather than inconclusive, and the district court must conduct a hearing pursuant to K.S.A. 2005 Supp. 21-2512(f)(2) and enter the appropriate order. Under the second motion concerning the shoes, shirt, and slacks, the district court must make findings of facts and conclusions of law regarding the DNA results depending upon Haddock's decision to proceed with further testing. Although we are reversing and remanding on both motions, we will proceed to consider Haddock's remaining arguments in the interest of judicial economy.

## False Evidence / Suppression of Favorable Evidence

In Haddock's original K.S.A. 60-1507 motion, he alleged numerous claims of prosecutorial misconduct, including: "Knowing Use of False Testimony/Subornation of Perjury" by "Robert Giles/GeneScreen," the improper use of Dr. Giles' testimony and report, and the failure to disclose lab test results of fingernail scrapings, eyeglasses, and the GeneScreen report. In a November 6, 1997, pro se "Motion to Dismiss Judgement of Conviction," Haddock asked the court to dismiss the judgment in the 60-1507 case which set forth violations of his due process rights, including the prosecution's knowing use of false testimony and failure to disclose evidence.

The district court declined to consider the allegations of prosecutorial misconduct in its March 30, 2001, memorandum order, reasoning that those issues were found without merit on direct appeal. At the August 7, 2002, hearing on the motion, the court found no evidence of prosecutorial misconduct as there "was full and complete discovery given to Mr. Haddock and his attorneys from the get-go in this case." Of particular note, the district court at this time refused to consider any evidence regarding Dr. Wraxall's review of the GeneScreen test concerning the shoes, shirt, or slacks because it was outside the scope of the proceedings. In the December 3, 2002, order denying Haddock's motion to dismiss, the district court found "no evidence of any prosecutorial misconduct" and "no evidence that the State was hiding evidence or failed to disclose evidence."

It is significant the district court had denied Haddock's 60-1507 motion alleging this particular "prosecutorial misconduct" after two separate hearings before Haddock attempted to seek additional testing on the shoes, shirt, and slacks. As he continued to obtain affidavits from experts and then obtain the additional DNA testing, Haddock tried to keep his K.S.A. 60-1507 proceedings alive by filing repeated motions to reconsider or to amend each court order as he further developed his arguments and obtained more information regarding the testing of the shoes, shirt, and slacks. The district court recognized this fact in an April 9, 2003, order

responding to Haddock's pro se "Supplemental Brief in support of motions that were properly before the court on Jan. 30, 2003":

"Mr. Haddock is advised that this Court lacks jurisdiction to entertain his arguments regarding alleged trial errors as many of them were either raised in his previous habeas petitions, or could have been raised in the previous petitions. However, if petitioner can show that any issue, which was not raised and could not have been previously raised, rises to the level of a constitutional violation, he can raise such issue(s) in a motion, pursuant to K.S.A. 60-1507. Arguments regarding the denial of his habeas petitions or motions construed as habeas petitions are properly presented on appeal to the Kansas Court of Appeals."

Likewise, in its final October 25, 2004, order, the district court found that it had ruled on all previous motions and refused to issue a final decision pursuant to K.S.A. 60-254 "to resurrect jurisdiction over the Court's previous rulings."

The district court in this case never performed any significant analysis concerning whether the defendant's due process rights were violated because he was convicted based on false evidence or explaining the basis for its conclusion that the State failed to disclose evidence. Moreover, it does not appear that the district court ever considered the evidence regarding the shoes, shirt, and slacks in this regard because Haddock went outside the scope of the initial K.S.A. 60-1507 and K.S.A. 2005 Supp. 21-2512 proceedings where the parties agreed to additional testing on only the glasses, the fingernail scrapings, and the hair.

In this respect, this case is analogous to *Wright v. State*, 2004 WL 502906 (Tex. App., unpublished opinion filed March 16, 2004), where the defendant asserted the trial court erred in denying relief under his postconviction DNA motion; however, the substance of his argument on appeal were allegations that the prosecutor had withheld exculpatory evidence. The court found these issues were outside the scope of an appeal from postconviction DNA proceedings and the court did not have jurisdiction to consider these arguments which should have been brought in a habeas corpus proceeding.

Thus, in this appeal, where the 60-1507 motion had been denied by the district court, the defendant's arguments concerning the falsity and the suppression of evidence concerning the shoes, shirt,

and slacks were not within the scope of the further proceedings under the second K.S.A. 2005 Supp. 21-2512 motion. As such, these issues are not properly before this court on appeal.

As to the defendant's due process claims regarding the hair and fingernail scrapings, Supreme Court Rule 183(j) (2005 Kan. Ct. R. Annot. 228) requires a district court reviewing a K.S.A. 60-1507 motion to make explicit findings of fact and conclusions of law regarding each of the movant's specific issues. When the lack of findings impedes appellate review, remand is required. *State v. Moncla,* 269 Kan. 61, 65, 4 P.3d 618 (2000). Although the district court provided minimal analysis on this issue, this court is able to resolve the issue based on the record before us.

In *Napue v. Illinois,* 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959), the United States Supreme Court overturned a murder conviction because a witness for the prosecution falsely testified he had received no promise of leniency in return for his testimony, and the prosecuting attorney, knowing the testimony was false, did nothing to correct it. The court reasoned: "[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment [citations omitted] . . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. [Citations omitted.]" 360 U.S. at 269.

In *Brady v. Maryland,* 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), the United States Supreme Court subsequently found: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution.*" (Emphasis added.)

"[T]he three components or essential elements of a *Brady* prosecutorial misconduct claim: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Banks v. Dretke,* 540 U.S. 668, 691, 157 L. Ed. 2d 1166,

124 S. Ct. 1256 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 144 L. Ed. 2d 286, 119 S. Ct. 1936 [1999]).

The failure to disclose such information under *Brady* warrants a reversal only if it is material, and evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. " 'A reasonable probability is a probability sufficient to undermine the confidence of the outcome.' [*United States v. Bagley*,] 473 U.S. [667] at 668." *In re J.T.M.*, 22 Kan. App. 2d 673, 680, 922 P.2d 1103, *rev. denied* 260 Kan. 993 (1996).

Haddock does not allege that the prosecutor knew the DNA evidence presented in this case was false; however, he argues the State still bears the responsibility for the introduction of false evidence under *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972). In *Giglio*, one assistant federal prosecutor promised a key government witness immunity if he testified at trial. Another prosecutor, with no knowledge of the promise, tried the case, and the witness testified at trial that he was still subject to prosecution. Giglio appealed the denial of his motion for new trial on the basis of newly discovered evidence.

On appeal, the Supreme Court discussed *Napue* and *Brady* and found that nondisclosure of evidence affecting the credibility of a key witness to the verdict falls within the general rule of *Brady* that suppression of material evidence justifies a new trial " 'irrespective of the good faith or bad faith of the prosecution.' " 405 U.S. at 153. The Court found that a new trial is not necessary unless a finding of materiality of the false evidence is made under *Brady* and the false testimony could in any reasonable likelihood have affected the judgment of the jury under *Napue*. The Court found that whether the nondisclosure was a result of negligence or design, it was the responsibility of the prosecutor, and a promise made by one attorney must be attributed to the prosecutor's office as an entity and as the spokesman of the government. As the government's case rested almost entirely on the witness' testimony, due process required that the conviction be reversed and remanded for a new trial. 406 U.S. at 154-55.

Haddock also cites *Matter of W. Va. State Police Crime Lab*, 190 W. Va. 321, 438 S.E.2d 501 (1993), where the prosecutor had no knowledge that its expert serologist witness willfully offered false testimony. Relying on *Napue, Giglio*, and *Brady*, the court concluded: "[I]t matters not whether a prosecutor using Trooper Zain as his expert ever knew that Trooper Zain was falsifying the State's evidence. The State must bear the responsibility for the false evidence. The law forbids the State from obtaining a conviction based on false evidence." 190 W. Va. at 325.

Contrary to Haddock's assertion, *Giglio* does not stand for the proposition that the State does not have to have any knowledge of the false testimony. Rather, the *Giglio* Court viewed the evidence under both the *Napue* and *Brady* lenses after seemingly concluding that the State's actions were not only a presentation of false evidence but a failure to disclose exculpatory evidence. See *State v. McCarty*, 271 Kan. 510, 514, 23 P.3d 829 (2001). Moreover, unlike this case, at least one of the prosecutors in the district attorney's office had knowledge that the testimony was false in *Giglio*.

In this case, Haddock breaks his arguments under *Napue/Giglio* and *Brady* into two separate issues. While it clearly does not matter whether the State had knowledge of its actions to establish a *Brady* violation, this court has subsequently interpreted *Napue* by stating: "A conviction obtained by the introduction of perjured testimony violates a defendant's due process rights if (1) the prosecution *knowingly* solicited the perjured testimony, or (2) the prosecution failed to correct testimony it *knew* was perjured." (Emphasis added.) *State v. McKinney*, 272 Kan. 331, 339, 33 P.3d 234 (2001) (citing *Napue*, 360 U.S. at 269). As Haddock concedes that the State had no knowledge that it was presenting false evidence through the testimony of its DNA expert in this case, our analysis under the *Napue* issue technically ends here.

Nevertheless, as these two issues are obviously interrelated, we consider whether the State presented false evidence or suppressed exculpatory or impeaching favorable evidence in violation of *Napue, Brady*, and *Giglio*. Before considering whether the presentation or suppression of evidence under either *Napue/Giglio* or *Brady* had a reasonable probability or likelihood of affecting the

jury's verdict, we must first determine whether the evidence was in fact false under *Napue* or was favorable and suppressed by the State under the first two steps of the *Brady* analysis. Although Haddock points to five key pieces of evidence, we address only the two pieces of evidence which were properly brought before the district court under the K.S.A. 60-1507 proceedings:

## 1. Hair Found in the Victim's Hand Came from Haddock

Haddock argues Dr. Giles' testimony that the hair found in the victim's hand was from a person with the DNA type 1.1/4, which was consistent with Haddock's profile and inconsistent with the victim, was false because it was inconsistent with his own Gene-Screen report which found weak 1.1, 1.2, and 4 alleles in the hair, indicating a mixed specimen, and accordingly excluding Haddock as a donor. Haddock points to defense expert Dr. Dean Stetler's opinion that Dr. Giles' testimony was somewhat inaccurate and misleading in that the hair may contain a contribution from Haddock, but could not be all from him. Moreover, Dr. Giles did not disclose the "well known" fact the PCR test would sometimes show a weak 1.1 when none was present and that one could assume that if the 1.1 and 4 came from the same person, they would be the same intensity.

However, the State responds that Dr. Giles admitted on cross-examination that it was not possible to determine if a 1.2 DQ Alpha type, such as from the victim, was also present in the hair sample. Further, he testified that 9% of the Afro-American population, 5.9% of the Hispanic population, and 7.4% of the Caucasion population had the same DNA type as Haddock, presumably suggesting that Haddock was not necessarily the donor. It further points out that Dr. Giles disclosed the presence of a third party in his report by stating that a specimen with more than two indicated genotypes is a mixed specimen coming from more than one person. Finally, the State argues that the faint 1.1 designation in the report would not necessarily preclude Dr. Giles from concluding that it existed based on the testimony by the State's expert Dirks that control tests are used on every PCR typing strip to assure the accuracy of the findings.

In this case, the subsequent more discriminating STR DNA testing showed that the hair was from a third-party female and not from the victim or Haddock. However, we must emphasize at the outset that this subsequent testing has no bearing on our analysis of whether the DNA evidence admitted at trial was false. Rather, we are evaluating whether Dr. Giles' testimony *based on the PCR testing method used at the time of trial* was false.

While it is easy to see from the trial transcript that Dr. Giles could have left the impression with the jury that the hair was consistent that Haddock was the sole contributor, careful review of the testimony as pointed out by the State reveals that Dr. Giles did not exclude the fact that an allele consistent with the victim (1.2) may have also been present in the sample and Haddock shared a DNA profile with a significant number of the population. As such, we conclude that Dr. Giles did not present false testimony based upon the PCR testing which was performed prior to the 1993 trial.

In this same vein, Haddock's argument that Dr. Giles failed to disclose exculpatory or impeaching evidence to the jury regarding the presence of three alleles in the hair sample is without merit. Both the GeneScreen report and Dr. Giles on cross-examination disclosed the possibility that the DNA mixture contained a 1.2 in addition to the 1.1 and 4. Although Haddock argues the GeneScreen report was exculpatory, defense expert Dr. Stetler agreed with Dr. Giles that it was possible based on the report that Haddock contributed to the DNA mixture. Finally, although Dr. Giles did not testify that the testing sometimes produces a nonexistent 1.1, this information was apparently inconsequential to this case. As the State's expert Dirks explained, the presence of a weak 1.1 is established by having its intensity compared with a control test before it would have been recorded. As such, Haddock has not demonstrated that Dr. Giles or the State failed to disclose exculpatory or impeaching evidence to the defense regarding the hair sample.

As this evidence was neither false under *Napue* nor suppressed under *Brady*, Haddock has not established a due process violation with regard to the hair sample.

## 2. Victim Scratched Haddock When She Was Attacked

At trial, the State presented evidence that the bruises and abrasions on both the victim's hands and arms were consistent with defensive wounds and that Haddock had fresh scratch marks on his wrists on the day of her death. Haddock was cross-examined about this theory at trial.

Haddock argues that Dr. Wraxall's posttrial DNA testing on the fingernail scrapings taken from the victim established that the scrapings were consistent with the victim. Haddock argues the absence of his DNA under the fingernails of the victim contradicted the State's evidence at trial that the victim scratched Haddock when he was attacking her and that this evidence was withheld from the jury.

Haddock's argument is without merit. The fact that the victim's own DNA evidence was found under her nails was not inconsistent with the implication at trial that the victim scratched Haddock. As the State correctly points out, the officer who observed the defendant's scratches described them as having "flaps of skin at the edge of the scratches." The presence of these flaps of skin still on Haddock's wrist is consistent with a finding that his DNA would not be found under the victim's nails. Moreover, Haddock makes no allegation that the State had performed similar DNA testing of the fingernails prior to trial and failed to turn it over to the defense. As such, Haddock has not demonstrated that evidence at trial concerning the scratching or the fingernail scrapings was false or withheld from the defense.

In conclusion, as the defendant has not established that this evidence was in fact false under *Napue* or was favorable and suppressed under *Brady*, we need not proceed to determine whether it had a reasonable likelihood or probability of changing the result of the trial.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his original pro se K.S.A. 60-1507 motion, Haddock alleged nearly 90 individual points of ineffective assistance of counsel. The district court's first memorandum order stated that Haddock had failed to demonstrate that counsel's representation fell below the

standard set forth in *Chamberlain v. State*, 236 Kan. 650, 694 P.2d 468 (1985), and the quality of representation was well above that required in order to constitute effective assistance of counsel:

" 'There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' [Citation omitted.] The Kansas Court of Appeals has determined that, in a situation where the State tests DNA evidence and finds that the defendant is implicated by that DNA, defense counsel's failure to submit the DNA sample for testing by an independent expert does not automatically render counsel ineffective. *Sanders v. State of Kansas*, 26 Kan. App. 2d 826, 995 P.2d 397 (1999). 'The fact is that independent testing might, as petitioner argues, have produced evidence in his favor; however, it also might have verified that the State's evidence was accurate. . . . The decision not to have the DNA independently tested was a tactical decision and not a deficient one, and we hold that it did not constitute ineffective assistance of counsel.' *Sanders*, 26 Kan. App. 2d at 829 []. The Court agrees with and applies the foregoing in denying petitioner's assertion of ineffective assistance of counsel."

At the August 7, 2002, hearing regarding Haddock's motion to dismiss based on the results of the first round of DNA testing under K.S.A. 2005 Supp. 21-2512, the court found that it had previously addressed the issue of ineffective assistance of counsel in detail in the 60-1507 motion. When defense counsel suggested that the court had not considered all of the issues (although he could not point to anything specific), the court ruled that it was denying the 60-1507 motion in its entirety, as the remaining issues were all matters that should have been addressed on direct appeal and defendant was attempting to retry the case under the guise of a 60-1507 motion.

On appeal, the defendant raises several claims of ineffective assistance of counsel. The following standard of review is applicable to each:

"Before counsel's assistance is determined to be so defective as to require reversal of a conviction, defendant must establish (1) counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than that guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing counsel's errors were so serious they deprived defendant of a fair trial. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. To show prejudice, the defendant must show a reasonable probability that

but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citation omitted.]" *State v. Hedges*, 269 Kan. 895, 913, 8 P.3d 1259 (2000).

These performance and prejudice prongs are mixed questions of law and fact requiring de novo review. *Easterwood v. State*, 273 Kan. 361, 370, 44 P.3d 1209, *cert. denied* 537 U.S. 951 (2002).

## Failure to Investigate Physical Evidence

### 1. Dr. Giles' DNA Findings / Independent DNA Expert

Haddock argues that trial counsel was ineffective in failing to investigate Dr. Giles' DNA findings and employ an independent DNA expert. Haddock asserted in his K.S.A. 60-1507 motion that trial counsel admitted to appellate counsel that the "report seemed so conclusive on page 1 that he never read any further." On appeal, he contends this failure to read and review the report fell below an objective standard of reasonableness and constituted a deficient performance because trial counsel was unable to cross-examine Dr. Giles about the exculpatory evidence that the hair in the victim's hand had an unexplained third allele that could not have come from Haddock.

Haddock presented no evidence at the hearings below or to this court on appeal that trial counsel in fact failed to read the entire report other than his unsubstantiated hearsay allegation in his petition, nor does he argue that the district court should have conducted an evidentiary hearing on this particular ineffective assistance of counsel issue. In viewing the record, we find it unlikely that trial counsel neglected to read the report, as he challenged the specific procedures used by GeneScreen in conducting the PCR testing in a pretrial hearing and filed a pretrial motion in limine seeking to exclude DNA evidence accordingly. See *Haddock*, 257 Kan. at 983-85.

Further, as discussed above, trial counsel did in fact point out on cross-examination that Dr. Giles' testing could not exclude the fact that a 1.2 allele, consistent with the victim, might also be pres-

ent in the hair sample. Additionally, in closing argument, the defendant argued:

"DNA hair is interesting. The DNA hair, we know the procedure that was used, the one in twenty method, not the more reliable procedure, but we know that of the procedure that was used, the exact quote from Doctor Giles was, 'It's not possible to determine if a one point two type may also be present,' and we know Barb had DX Alpha, one point one and one point two. We know the hair was a body hair, not a head hair, not a toupee hair, while there is a follicle on it. Is that so uncommon to have body hair in your own hands, and yet they say beyond a reasonable doubt they've shown that it's Ken's body hair, and there's no explanation that it's Ken's or Barb's. State hasn't shown beyond a reasonable doubt that it's Ken's hair."

If defense counsel had sought further DNA testing, it is entirely possible that this allele could have been proven not to be present at all and thus an argument for attacking the results would be lost. See *Sanders v. State*, 26 Kan. App. 2d 826, 829, 995 P.2d 397 (1999), *rev. denied* 269 Kan. 932 (2000) ("Defense counsel had shown the State's evidence to have some exploitable weaknesses which would disappear if another and independent test verified the original results."). As such, despite Haddock's claims to the contrary, there is support for the district court's conclusion that the decision not to seek further DNA testing was tactical rather than deficient.

Haddock also argues that defense counsel was deficient in failing to consult with an independent DNA expert and learning that the particular test performed in this case sometimes gives a spurious, weak 1.1 allele when none is present at all. In the absence of this 1.1 allele, Haddock would have been excluded as the source of the hair. As previously discussed, the State's expert Dirks testified that the 1.1 allele detected by GeneScreen would have been compared with a control allele to determine whether it was in fact present. As such, it appears that this particular information would have had little effect on this case.

Defense counsel was not ineffective in failing to investigate Dr. Giles' DNA findings and employ an independent DNA expert or in failing to consult with an independent DNA expert.

## 2. Bloody Shoeprints

At trial, Johnson County Criminalistics Trace Analyst William Chapin testified that bloody shoeprint evidence with a "pretty well-defined pattern" was found at the crime scene. Frank Hartley, a neighbor who tried to resuscitate the victim, testified that he was wearing tennis shoes that day. Hartley testified that he saw a picture of the shoe prints at the scene and identified them as his own.

Michael Kelty, a shoe impression expert from the Johnson County Crime Lab, testified on behalf of the State that his comparison of Hartley's shoes to the partial shoe impressions found on the floor of the garage was inconclusive. He opined that the patterns of the sole were similar, but there were not sufficient individual characteristics to make an identification. On cross-examination, defense counsel elicited testimony that the impressions absolutely did not match Haddock's wingtip shoes.

At the February 20, 2001, hearing on Haddock's K.S.A. 60-1507 motion and first motion for DNA testing, shoe print comparison expert John Cayton testified on behalf of Haddock over the State's objection that this evidence had nothing to do with the motion for DNA testing. Haddock explained in part that this issue was embraced in Haddock's lengthy 60-1507 motion which initiated the case. Cayton reviewed pictures of prints from Hartley's shoes and pictures of the bloody shoeprints and concluded that there was some difference between the two, but without further examination, he could not make a determination of whether Hartley's shoes made the impressions.

The defendant argues that trial counsel was obviously aware that there were bloody shoeprints at the crime scene and the State's own expert could not conclusively match those prints to Hartley's shoes. As such, he contends trial counsel was ineffective in not hiring its own shoeprint expert to point out differences in the prints to raise the possibility that the print was left by the victim's true killer.

The problem with the defendant's argument is that the State's expert at trial essentially performed this task for the defense by being unable to positively identify the shoeprints as belonging to

Hartley and clearly ruling out the possibility that it was left by Haddock's shoes. Moreover, Cayton's testimony on behalf of the defense in the posttrial hearing that he likewise could not make a definitive determination certainly does not aid Haddock's argument that defense counsel would have been able to obtain an expert to provide any new evidence that would have affected the outcome of the trial. As such, the defendant's trial counsel was not deficient in failing to obtain a shoeprint expert at trial.

3.  <u>Eyeglasses</u>

Haddock argues that trial counsel made no investigation into a pair of broken eyeglasses found at the crime scene and did not learn that they did not belong to Haddock or the victim prior to trial. Haddock argues that if trial counsel would have investigated the glasses and submitted them for DNA testing, the jury would have heard from a DNA expert such as Dr. Wraxall that the glasses revealed the presence of DNA consistent with the victim, a female, and a mixture of DNA profiles with some indication of male DNA which was not consistent with Haddock, which would suggest that someone other than Haddock and the victim were present at the crime scene.

The State first responds that Haddock's argument is premised on the subsequent and far more discriminating STR DNA analysis which was not available at the time of trial in this case. This point has merit. Haddock offers no evidence that these same results would have been achieved if the State or the defense had sought Alpha Q DNA testing at the time of trial.

The State also points out that there was no showing in any of the hearings that the defendant was unaware of the glasses found in the garage. The evidence suggested that the glasses belonged to the victim, as they were found next to the victim's body, the victim wore glasses, she was struck on the head numerous times, she was dragged across the garage floor, and the lenses to the glasses were no longer attached to the frames. Although the victim's son said in a posttrial hearing that the victim's glasses were accounted for, he subsequently testified that the victim may have owned more than one pair of glasses.

Further, it is significant that the only DNA identified on the glasses by Dr. Wraxall was that of the victim. Although the defendant argues that evidence of extraneous DNA would help prove the presence of a third person, his own expert testified that the presence of multiple sources of DNA is "not too surprising if you think of a pair of glasses that is particularly if it's utilized or handled by different people, you can certainly get small amounts of DNA." Moreover, the glasses were found on a garage floor which also raises contamination issues. As such, the defendant has not established that trial counsel was deficient in failing to investigate and obtain further DNA testing on the glasses.

4.   Fingernail Scrapings

Haddock argues that trial counsel's failure to submit the victim's fingernail scrapings for DNA testing constituted ineffective assistance of counsel. Had counsel done so, counsel could have submitted evidence similar to Dr. Wraxall's findings that the scrapings were consistent with the victim's DNA and showed no presence of male DNA, contrary to the State's theory that the scratches on Haddock's wrist were from the victim.

The problem with this argument is that, as discussed above, the evidence showed that the scratches on Haddock's wrist were fresh and still had the flaps of skin hanging from them. This would be consistent with further DNA testing that revealed only the victim's DNA in the scrapings. Moreover, it is clear from closing argument that trial counsel's decision not to submit the scrapings for further DNA testing was a tactical decision which enabled counsel to cast doubt on the State's theory at trial:

"Where's the evidence of the fingernail scrapings with respect to that, if it's consistent with their theory? You got the body hair when you were scraping his hairy arms. Where's that evidence? You don't see it, because it's not there, because the State hasn't proven the case beyond a reasonable doubt."

Had the defendant proceeded with the testing, a possibility existed at that time that the DNA might be consistent with Haddock, which would preclude this argument. As such, the district court properly concluded that the decision not to have the DNA inde-

pendently tested was a tactical decision and not a deficient one. See *Sanders*, 26 Kan. App. 2d at 829.

5.   Cumulative Error

Haddock argues he was prejudiced by trial counsel's failure to investigate the physical evidence in this case and call an expert DNA witness because ultimately the postconviction DNA testing showed that the DNA evidence used at trial was false. Haddock further contends trial counsel's failure to investigate deprived him of the right to present his theory of defense that another person committed the crime.

As discussed above, Haddock has not established that defense counsel was deficient in failing to conduct further investigation and obtain further DNA testing in this case, nor has he established that his conviction was based upon false evidence. As such, there is no need to consider the prejudice prong of the test.

## Failure to Object to Closing Argument

During closing argument of trial, the prosecutor made the following statements relevant to this issue:

"[T]he mouthpiece in this case for the defendant, at least in part, is the defendant himself, and if he's telling lies in this case about material things such as the clothing that he's wearing, he has to live with those lies . . . ."

"[Y]esterday I could have sworn I heard the defendant say under no uncertain terms when . . . Mr. Hobbs picked the shirt up and showed it to him, he said, 'I did not wear this shirt on November the 20th,' but yet, he comes in here today, this morning, and says, 'No. I did wear that shirt on November 20th, and I wore it and took it off over the noon hour because the seventh button was missing.' The defendant also tells you that the spacing between the buttons is such that it was obvious that the button was exposed to his wife, and he tells you the spacing is different than the shirt that he has on right here. *Why, ladies and gentlemen, why would you lie about that sort of thing? I would contend to you that we had one very bright, intelligent defendant, who has sat here throughout the entirety of this case, listened to every witness that has come through the door, and weighed and gauged, just so he could weave his story to fit the facts in this case, and he's had to change his story in a way that he feels is going to be most palatable to you, as jurors.* Some of the stuff he couldn't get around, like the sweater. It's just very clear from the tape that he contends to you that the reason that the sweater was put on was so that he could meet with an attorney. That's what he tells Detective

Roger Larue, yet he's off to parts unknown that entire afternoon, never once getting back with his office to see whether or not his attorney has checked in.

"*Why are we lying about the sweater? Well, again, the clothes, ladies and gentlemen, are the key to this case. The clothes are the key to this case.*" (Emphasis added.)

"The reason that he's lying about the clothing and the reason he's trying to play a confusion game with you, ladies and gentlemen, about the clothes is because he wants like heck for you to buy the notion that he did not wear those pants on November the 20th."

"[W]hat is going to speak loudly and clearly for Barbara Haddock is that pair of pants and those shoes, and you can't alter the pair of pants and you can't alter the shoes. *You can alter a watch. You can alter a pile of logs. You can pull a vehicle out, and you can do a lot of lying afterward to try to cover your tracks, but you can't alter what's contained on the pair of pants and you cannot alter what's contained on those shoes.*" (Emphasis added.)

Haddock argues trial counsel was ineffective in failing to object to the State's closing argument where the prosecutor repeatedly improperly argued that Haddock was lying to the jury, citing *State v. Pabst*, 268 Kan. 501, 505-07, 996 P.2d 321 (2000), and *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997). The State responds that trial counsel in 1993 would not be expected to divine the future of this appellate case law and refers this court to case law in effect at the time of trial, in addition to more recent case law.

We recognize that Haddock is attempting to raise a trial error, *i.e.*, prosecutorial misconduct, under the guise of a K.S.A. 60-1507 motion claim of ineffective assistance of counsel in order to overcome the fact that he did not raise the issue on direct appeal or claim exceptional circumstances existed for his failure to do so. See Supreme Court Rule 183(c)(3) (2005 Kan. Ct. R. Annot. 228). Regardless of whether we consider the issue, Haddock's argument is without merit.

In order to determine if counsel was deficient for failing to object to these statements under the first step of the ineffective assistance of counsel analysis, the court must determine whether the statements constituted prosecutorial misconduct:

"A two-step analysis is applied to allegations of prosecutorial misconduct. First, the court decides whether the prosecutor's comments were outside the wide lat-

itude allowed in discussing the evidence. Second, the court must decide whether the comments constitute plain error, that is, whether the statements prejudiced the jury against the defendant and denied him or her a fair trial, thereby requiring reversal. The second step is a particularized harmlessness inquiry for prosecutorial misconduct cases."

"In the second step of the two-step analysis for alleged prosecutorial misconduct the appellate court considers three factors to determine if the prosecutorial misconduct so prejudiced the jury against the defendant that a new trial should be granted: (1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), have been met." *State v. Tosh*, 278 Kan. 83, Syl. ¶¶ 1, 2, 91 P.3d 1204 (2004).

In this case, the State correctly points out that Haddock bases his argument on cases which were decided several years after his 1993 trial. See *Bryant v. State*, 280 Kan. 2, 10, 118 P.3d 685 (2005) (attorney was not ineffective for failing to predict a judicial ruling that had not been yet announced). In order to address the first prong of the prosecutorial misconduct issue, it is first necessary to review the relevant case law.

In *State v. McClain*, 216 Kan. 602, 608, 533 P.2d 1277 (1975), the defendant argued he was denied a fair trial because the prosecutor in his closing argument injected his personal belief or opinion as to appellant's credibility as a witness. This court rejected that argument reasoning:

"Here there was no contemporaneous objection to the argument now complained of and that might well end the matter [citation omitted]. However, in our opinion the argument amounted to no more than comment on the inherent improbability of the testimony given by appellant and was not improper. *Counsel may comment on the credibility of a witness where his remarks are based on the facts in evidence and a considerable latitude is allowed in that discussion* [citation omitted]. Appellant was not prejudiced by the prosecution's closing argument." 216 Kan. at 608.

Prior to the defendant's trial in this case, this court later clarified that the failure of counsel to object to improper comments by the

prosecutor precluded appellate review. *State v. Crabtree*, 248 Kan. 33, 37, 805 P.2d 1 (1991).

In *State v. Whitaker*, 255 Kan. 118, 872 P.2d 278 (1994), the prosecutor vouched for one witness' credibility and repeatedly suggested the defendant was lying or called him a liar when discussing the inconsistencies in his testimony during closing argument. The State argued prosecutors had wide latitude and this was a response to an attack by the defense on the credibility of its own witnesses. The court found that comments improperly characterized the defendant as a liar but did not so prejudice the jury against him so as to deny him a fair trial under the standard applicable at that time, *i.e.*: "Improper remarks made in closing argument are grounds for reversal only when they are so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial." 255 Kan. at 134-35.

In contrast, the *Pabst* court found reversible error where the prosecutor accused the defendant of lying 11 times during closing argument despite repeated objections by the defense. The court reasoned in part the assertion that the defendant was a liar was improper because it is improper for a lawyer to comment on a witness' credibility. 268 Kan. at 506. In so finding, the court disapproved of contrary language in *McClain* ("Counsel may comment on the credibility of a witness where his remarks are based on the facts in evidence and a considerable latitude is allowed in that discussion."). *Pabst*, 268 Kan. at 507. Moreover, the court found that the failure to raise a contemporaneous objection did not necessarily preclude appellate review:

"Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial. See *State v. Sperry*, 267 Kan. 287, 308, 978 P.2d 933 (1999). Some complained-of prosecutorial statements were not objected to at trial. If the claimed error has been determined to implicate a defendant's right to a fair trial, *our standard of review is the same whether or not an objection was made at trial.* If the claimed error rises to the level of a denial of the Fourteenth Amendment right to due process, the issue will be addressed. [Citation omitted.]" (Emphasis added.) *Pabst*, 268 Kan. at 504.

In this case, virtually all of the statements complained about on appeal were suggestions that the defendant was lying about the

clothing he was wearing when he came home for lunch and why he changed clothing. Even under the more liberal standard set forth in *McClain* permitting counsel to comment on the credibility of the witnesses, we cannot say that the prosecutor's repeated statements that Haddock was lying were nothing more than pointing out inconsistencies based on the facts in evidence. Even in *Whitaker*, which found no reversible error, we found that similar repeated statements characterizing the witness as a liar were improper.

Likewise, under *Pabst* and subsequent cases, it is clear that "calling the defendant a liar . . . [is] outside the wide latitude allowed to prosecutors in closing arguments." *State v. Donaldson*, 279 Kan. 694, 709, 112 P.3d 99 (2005). As such, we conclude the comments in this case repeatedly characterizing Haddock as lying were clearly improper, and counsel was thus deficient in failing to object to these improper comments at trial.

This leads to the second prong of both the prosecutorial misconduct and ineffective assistance of counsel analyses; both involve the resulting prejudice to a defendant. Haddock does not suggest, and the record does not show, that the prosecutor's statements were gross and flagrant or reflected ill will on the part on the prosecutor. Rather, Haddock cites a myriad of cases from other jurisdictions and jumps straight to the prejudice prong of the analysis. He contends that his credibility regarding what clothes he had on the day of his wife's murder was significant and these "statements would likely have great weight in the minds of the jury in this case." See *Lockhart*, 24 Kan. App. 2d at 492-93.

There is no doubt that the defendant's credibility regarding the clothes was important to the case. However, even if the defendant's objections to this argument had been sustained, no reasonable likelihood exists that the outcome of the trial would have been any different. These comments reflected a minuscule part of a 5-day trial and were likely to have little weight in the minds of the jury. The jury heard Haddock's testimony at trial and was able to judge for itself whether his explanations were credible. Additionally, whether the jury believed the defendant's reasons for changing clothes over the lunch hour or not, this did not change the over-

whelming circumstantial evidence of the defendant's guilt presented at trial, even if we exclude the DNA evidence from our consideration. Thus, neither the prosecutorial misconduct itself nor the deficient performance of counsel amounted to prejudicial error.

We additionally note that although Haddock is asserting that counsel's failure to object violated his constitutional right to a fair trial, the standard of appellate review would have remained the same if the prosecutorial misconduct issue had been raised on direct appeal in the absence of an objection. Haddock failed to raise this particular prosecutorial misconduct on direct appeal, and he asserts no exceptional circumstances for the failure to raise this issue on direct appeal. See Supreme Court Rule 183(c)(3) (2005 Kan. Ct. R. Annot. 228). As such, Haddock is unable to establish that he would have been prejudiced on appeal by counsel's failure to object to the alleged prosecutorial misconduct.

## Failure to Impeach Sherry Benn's Testimony

Haddock argues his trial counsel was ineffective in failing to impeach Sherry Benn's testimony which contradicted her statement to Detective James Pyke.

At trial, Sherry Benn testified that she called the victim between approximately 1:30 and 2 p.m. the afternoon the victim was found. The victim said she was making some chili and mentioned that Haddock had come home for lunch that day. Benn testified that based on this response, she could not tell, nor did she ask, whether Haddock was there at the time of the phone call. On cross-examination, Benn denied that the victim told her that Haddock had been home for lunch and had just left before she called. She also denied saying that to Detective James Pyke as well.

Haddock argues that trial counsel's failure to impeach Benn's testimony by introducing Detective Pike's report as evidence or by calling Detective Pike to testify amounted to a deficient performance under *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1974). The report provides in relevant part:

"Sherry advised she returned to work from her lunch break at approximately 1330 hours, 11-20-92. She did some work at the office and then called Barbara Haddock

"at home. Sherry estimated the time as being almost 1400 hours. She talked with Barbara on the phone for less than five minutes. Sherry stated Barbara talked about her husband had been home for lunch and had just left before Sherry called her."

Haddock contends this impeachment would have bolstered his assertion that he had already left the house before 2 p.m. that day which would have seriously undermined the State's theory that Haddock was in the house at the time of the crime.

The State first points out that no evidence was presented on this issue before the trial court and Haddock's recitation of what was said in the report was simply an assertion in his K.S.A. 60-1507 motion. In his reply brief, Haddock blames this on the district court's failure to conduct an evidentiary hearing on the ineffective assistance of counsel issues raised in his 60-1507 motion or to make findings of fact and conclusions of law as required by Supreme Court Rule 183(j) (2005 Kan. Ct. R. Annot. 228). He seeks to remedy the fact that the police report was not presented to the trial court below by attaching it as an appendix to his reply brief.

However, an appendix to an appellate brief is not a substitute for the record on appeal, and material so attached will not be considered by this court. Supreme Court Rule 6.02(f) (2005 Kan. Ct. R. Annot. 36); *In re Gershater*, 270 Kan. 620, 633-34, 17 P.3d 929 (2001). Moreover, "[e]vidence not presented to the trial court will not be considered for the first time on appeal." *Volt Delta Resources, Inc. v. Devine*, 241 Kan. 775, 782, 740 P.2d 1089 (1987).

Even if this court were to consider the issue, the testimony at issue was not as prejudicial as suggested by the defense. See *Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

The State's general theory at trial was that the murder happened around or shortly after 2 p.m. The Haddock's neighbor, Jackie Rowles, testified that she saw Haddock's van parked in the driveway at 2 p.m. but it was gone at 3:20; the mail carrier saw someone matching Haddock's description picking up mail from a community mail box at about 2 pm; and another neighbor, JoEllen VanDyke,

testified that she heard a noise like something had fallen outside about 5 or 10 minutes after 2 p.m. Haddock himself testified at trial that he left the house to get the mail at approximately 1:45 and that he left the house again at approximately 2 p.m. to go to the library.

Benn's testimony was in this same vein. She could not definitively remember what time she called the victim, suggesting it was approximately 1:30 to 2 p.m. Even if the defense had impeached her testimony with the report where she said the victim had stated the defendant just left, there is not enough discrepancy in approximate times so as to have made a difference in the trial. For example, the victim could have been referring to Haddock leaving to get the mail or he could have just left shortly after 2 p.m., if the times are only approximate. Moreover, without presenting the report, trial counsel did suggest on cross-examination that Benn's trial testimony in this regard was inconsistent with her statement to the police. As such, it cannot be said that the failure to impeach this brief exchange was so serious that it deprived Haddock of a fair trial.

## CONCLUSION

(1) We reverse and remand the district court's order regarding Haddock's first motion for DNA testing under the provisions of K.S.A. 2005 Supp. 21-2512.

(2) We reverse and remand the district court's order regarding Haddock's second motion for DNA testing.

(3) We affirm the district court's denial of Haddock's K.S.A. 60-1507 motion.

Affirmed in part, reversed in part, and remanded for further proceedings under K.S.A. 2005 Supp. 21-2512.