IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,600

STATE OF KANSAS,
*Appellee*,

v.

JEROME EDWARDS,
*Appellant*.

SYLLABUS BY THE COURT

Even when additional DNA testing ordered under K.S.A. 2019 Supp. 21-2512 leads to results favorable to the defense, a district judge does not necessarily abuse his or her discretion by denying a motion for new trial. The judge must evaluate whether the results are "of such materiality that a reasonable probability exists" a new trial would lead to a different outcome. If a reasonable person could agree with the district judge's decision on whether a reasonable probability exists, there is no abuse of discretion.

Appeal from Shawnee District Court; EVELYN Z. WILSON, judge. Opinion filed July 17, 2020. Affirmed.

*Kristen B. Patty*, of Wichita, was on the brief for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.:  In 1996, a jury convicted Jerome Edwards of first-degree murder, conspiracy to possess with intent to sell hallucinogenic drugs, and aggravated robbery.

1

Seventeen years later, a district court judge granted Edwards' request for DNA testing on some items found at the crime scene. Edwards filed a motion for a new trial on the basis of the DNA testing results. The district judge denied the motion. Edwards appeals.

We hold that Edwards is not entitled to a new trial on the basis of the DNA test results.

FACTUAL AND PROCEDURAL HISTORY

This court laid out the facts underlying Edwards' convictions in its 1998 decision rejecting his arguments, with one exception concerning a nunc pro tunc order to correct a journal entry. Given the intervening 22 years, we repeat the fact section of the decision here:

"The events in this case concern the February 19, 1996, murder and robbery of Donnie Smart, a small-time dealer of marijuana, in Topeka. The defendant was charged with felony murder; conspiracy to possess with intent to sell, deliver, or distribute, offer for sale, or sell a hallucinogenic drug; and aggravated robbery in connection with the incident. Prior to trial, the defendant moved to suppress a photographic lineup identification. After a full hearing, the trial court denied his motion.

"The State called 19-year-old Larry Huggins, Jr., who testified that he was walking down the street on the day of the killing when he was approached by two individuals, one of whom he identified as the defendant. Huggins had met the defendant previously. Huggins identified the other person with the defendant only as Shawn.

"According to Huggins, the defendant and Shawn wanted to purchase two quarter-pound bags of marijuana. Huggins mentioned that he had previously purchased marijuana from Smart. Huggins stated that Smart was not a 'big-time' dealer but was known to sell marijuana occasionally. Huggins was to receive a half-ounce of marijuana for arranging the deal.

2

"Huggins testified that the group drove in his cousin's blue Ford Escort to Smart's house because Smart would know the car. They parked in front of what he thought was Smart's house and saw Smart walking down the steps of an apartment building nearby. Smart and his family were in the process of moving from the house to the apartment building on that day. Huggins told Smart about the group's desire to purchase the marijuana, and Smart told them to come back in a couple of hours. They left, and while driving around, the defendant and Shawn asked Huggins if Smart was 'somebody we could lick.' Huggins felt that they were asking whether Smart would be a good person to rob.

"The group returned to Smart's apartment 2 hours later. When they arrived, the defendant and Shawn went to the door. Huggins testified that both the defendant and Shawn were armed. Huggins saw Smart's wife, Heather, open the door. The defendant and Shawn then returned to the car and told Huggins that Heather had told them to come back later.

"Huggins testified that when the group came back for the third time, both the defendant and Shawn were again carrying guns. According to Huggins, the defendant was carrying a blue steel .38 caliber pistol while Shawn was armed with a chrome 9 mm. pistol. Huggins testified that the defendant was wearing a starter jacket and black pants while Shawn was wearing a hooded sweatshirt. Huggins watched them walk up, knock on the door, and then go in the apartment. After approximately 5 minutes, he heard two gunshots. Huggins started the car and was going to leave when he saw the defendant and Shawn running out of the apartment. They jumped into the car and Huggins drove off.

"The defendant told Huggins that Smart was drunk and had come after them so they had to shoot him. The defendant said that when they weighed the marijuana, the defendant had tried to grab it. Smart charged him, and the defendant shot into the floor once and then shot Smart in the shoulder. Huggins testified that he dropped the defendant off at his car and then went home.

"Huggins admitted that he had not identified the defendant in a photographic lineup. He stated that he recognized the picture of the defendant but lied to the police and

3

only told them the truth after he was threatened with a murder charge. Huggins stated that he was charged with conspiracy and aggravated robbery and that in return for his testimony, he would avoid being charged with murder.

"Heather testified that on the day of the murder, she had been moving things in the apartment when she heard her husband whistle. He then came into the house and told her that some persons had wanted to buy a half-pound of marijuana. Heather testified that her husband used marijuana and sometimes sold small amounts. However, she was scared when she heard that someone wanted a half-pound because Smart had never sold that large an amount before. She stated that Smart reassured her by telling her that 'Big Larry' (Huggins) was involved and that he had known him for awhile.

"Heather testified that Smart and two friends, Raymond Slater and Jeremy Brown, left to purchase the marijuana. Heather stated that she was sick to her stomach because she was nervous, and she went to lie down with the couple's baby. She then heard a knock on the door. When she answered the door, a black male she identified as the defendant was there, asking for Smart. She told the defendant that Smart was not home but that he would be back within the hour. The defendant told her that he and his companions would return at 7:15 p.m.

"Smart, Slater, and Brown came back to the apartment. Smart began weighing the marijuana. Just after 7:15, the group decided that the defendant and his companions were not coming back and began dividing the marijuana among themselves. They rolled one joint and took turns smoking it. Heather testified that she went into the kitchen and when she came back out, the front door was partially open. The defendant and another person were standing just outside. Smart told her to let them in and she did.

"According to Heather, Smart approached the defendant and the other person and said, 'What's up?' She believed that Smart seemed to recognize the defendant. Smart, the defendant, and the other person then went into the back of the apartment. She sat in the living room. After awhile, she heard Smart raise his voice, and Slater went back to check on the situation. Shortly thereafter, the defendant came around the corner with a silver gun in his hand shouting, 'Nobody move, or I'll shoot.' The defendant then turned back, and the other person came into the living room followed closely by Smart and Slater.

4

There was pushing and shoving. Heather testified that as they came past her, Smart tossed a bag of marijuana to her, which she threw over her shoulder into the kitchen.

"A struggle ensued at the door of the apartment. Smart had his arms around the defendant's waist and was ramming his shoulder into the defendant when the defendant fired his gun. There was more scuffling, and the defendant fired again. Smart slumped to his knees. Heather ran to the telephone, dialed 911, and then ran back and unsuccessfully tried to resuscitate Smart.

"When first questioned by the police, Heather did not mention the marijuana. However, when she found out that Smart had died, she told the police everything that had happened.

"Heather told the police that the person with the gun was about 5'9", with cornrows in his hair, and wearing a light-colored tan or white starter jacket. She described the other person to police as wearing a gray fleece sweatshirt. However, Heather testified that when she saw the defendant's picture in the photographic lineup, she realized that she had made a mistake and that the person in the gray fleece sweatshirt, not the person with cornrows, had been the shooter. Heather stated that she looked at between 600 and 1,000 pictures in an effort to identify the shooter. However, she testified that at the moment she saw the defendant's face in the photograph, she realized he was the shooter. Heather said that '[w]hen you see your husband shot and killed in front of you and you see a face, you remember that face for the rest of your life.' At trial, Heather also identified the defendant as the person who shot Smart.

"Raymond Slater, a friend of Smart's who was present during the shooting, also testified. In court, he identified the defendant as the person who shot Smart. Slater stated that when the defendant and the other person arrived to purchase the marijuana, Smart motioned them into the bathroom to take care of the deal. Slater testified that the other person went into the bathroom while the defendant stayed just outside the bathroom door. Later, Slater heard Smart raise his voice and knew something was wrong. Slater went back to the bathroom to check on the situation, and he and the defendant glared at each other for approximately 5 to 10 minutes. Slater testified that while he and the defendant

5

were staring at each other, Smart and the other person were arguing over the weight of the marijuana.

"The defendant then moved into the bathroom, so Slater also went in. Slater testified that the defendant stepped around the corner, then stepped back holding a gun. According to Slater, the defendant stated, 'Give us the fucking dope or else I'm going to shoot you!' Smart and the other person both grabbed for the marijuana. Slater moved in to join the scuffle, but the defendant said, 'You make one more move and I'll blow your head off.' The other person ran out of the bathroom followed by the defendant, Smart, and Slater. Slater testified that Smart grabbed the defendant and tried to drag him to the ground. Smart grabbed the defendant by the waist and slammed him against the door. Slater testified that he heard two shots. He swung a beer bottle at the defendant and saw Smart slump to the ground. The defendant ran out the door.

"Slater stated that he ran out the door after the assailants, but someone pointed a gun at him and he backed away. He testified that the assailants got into a tan or cream-colored compact car like a Volkswagen Rabbit and drove away. He followed them to a nearby grocery store parking lot and called police from there.

"Slater testified that he told police that the person he later identified as the defendant was 5'7" tall and that the other person was 6'2" or so with cornrows in his hair. Slater stated that he looked at hundreds of pictures of suspects on three occasions and when he saw the defendant's picture, he was sure the defendant was the shooter.

"On cross-examination, Slater admitted that on the day of the murder he had been drinking all day but stated that he was not affected by it. Slater testified that he had been with Smart when the defendant and others drove up the first time to talk about purchasing marijuana. He stated that the defendant and the others had been in a four-door Mercury with tinted windows. When shown a picture of a car belonging to the defendant's girlfriend, he stated that it was not the car he had seen at that time. On redirect, he stated that although he wanted to see Smart's killer brought to justice, he would not want to falsely accuse anyone of a crime because he himself had been falsely accused and he knew how it felt.

6

"Jeremy Brown, another person present at the shooting, also testified. Brown's testimony was generally consistent with that of Slater and Heather. He testified that one of the assailants was 5'7" and about 160-65 pounds and dressed in a hooded sweatshirt. The other assailant was 6'1" and heavyset, possibly 250 pounds. Contrary to the testimony of Slater, Brown testified that the assailants escaped in a blue Ford Escort. Brown testified that this was the same Escort he had seen Huggins exit from earlier in the day.

"Jeremy stated that when questioned by police, he told them that he did not know who the shooter was but if he could talk to Slater or Heather, they might be able to come up with a name. He stated that he was unable to identify the defendant as the shooter in a photographic lineup.

"Kevin Igercic, another friend of Smart's who was present that evening, also testified. Igercic stated that he had been sitting in Smart's apartment waiting for his mother to pick him up when one of the people talking to Smart in the back of the apartment pulled a gun. Igercic stated that Smart and the shooter were in the living room headed for the door when the first gunshot went off. Smart tried to grab the shooter and another shot went off. After the second shot Smart said, 'Kevin, dial 911' and fell over. Igercic described the shooter as being 6'1" tall and the other person as 6'4", based on his estimation of Smart's height at 5'9." Smart was actually slightly over 5'6" in height.

"Igercic testified that he could not identify anyone in the lineup shown to him. He stated that at one point, he might have told police that the shooter had on an Oakland Raiders starter jacket.

"According to Shawnee County Coroner Dr. George E. Thomas, Smart died as the result of a gunshot wound which entered into his left arm on a downward angle as if the arm was held above the body. The bullet then continued through the arm and into the body, fracturing a rib and penetrating the left lung, pulmonary artery, aorta, right lung, diaphragm, liver, and right kidney. Stippling on the wound indicated that the shot was fired from close range. A second gunshot wound on the left shoulder was not a factor in Smart's death.

7

"David A. Smith, an officer with the Topeka Police Department, testified that he was called to the shooting scene, where he recovered drug paraphernalia and marijuana from the bathroom. He also recovered two .38 caliber shell casings from the living room area.

"Robert Cilwa, a [Kansas Bureau of Investigation] firearms expert, testified concerning the shell casings. Cilwa testified that the cartridges found on the scene were .38 caliber. He noted that while it was possible for .38 caliber shells to be fired from a 9 mm pistol, he did not think, based on the condition of the cartridges, that these cartridges had been fired from a 9 mm pistol.

"The State also called a witness who testified that she was a prostitute who habitually worked in the neighborhood where the shooting took place. She stated that on the night of the shooting, she saw a blue Ford Escort heading down the street near Smart's apartment and saw two men exit the vehicle and go up the stairs to the apartment. However, at trial, she stated that the defendant was not one of those persons.

"Detective Mike McAtee of the Lawrence Police Department stated that he went to the restaurant where Tina Ostrander, the defendant's girlfriend worked to see if the defendant was there. McAtee testified that he saw a red Toyota which belonged to Ostrander, but she was not at work. He learned that the defendant and Ostrander were at her apartment, and he and several other officers went to that apartment. McAtee stated that there was a smell of marijuana coming from the apartment. McAtee testified that he and several officers entered the apartment and placed the defendant in custody. A search of the apartment revealed drug paraphernalia and marijuana as well as a gray hooded sweatshirt.

"Prior to the State's calling of witnesses to testify regarding the arrest of the defendant, the defendant renewed his objection to any discussion regarding the fact that marijuana was found at the place where the defendant was residing. The district court overruled the objection.

"Cindy Patterson, a KBI forensic chemist, testified concerning both the marijuana found in the defendant's apartment and the marijuana found at the scene of the

8

shooting. She confirmed that both substances found were marijuana but stated that it was impossible to tell whether they came from the same batch of marijuana.

"Detective McAtee also testified concerning certain field notes he had taken during an interview he conducted with Ostrander. Ostrander stated that the defendant and a man named William Burton Clay often talked to her about 'ripping people off for weed.' She also told him that on the night of the murder, the defendant was out of town late into the night and when he returned he told her that he had 'jacked' some people.

"The State called Ostrander to the stand. She testified that on the day of the shooting the defendant was fixing her car. She stated that she saw him in Lawrence between 8 and 8:30 p.m. on the evening of the shooting.

"Thomas Young, a detective with the Topeka Police Department, also testified on behalf of the State. Young stated that he worked on the investigation of the shooting and that he went to Lawrence with several other officers to apprehend the defendant. Young questioned the defendant after his arrest. Young testified that the defendant answered biographical questions but, when read his rights, stated that he did not want to talk further and wanted an attorney. At this point, the defendant objected on the grounds that it was impermissible to comment on his post-*Miranda* silence. The court asked whether the defendant would like a cautionary instruction, and the defendant declined.

"Young testified that as he was preparing to leave the room, the defendant stated that he wanted to talk again. As Young was informing the defendant about the crime, the defendant asked, 'Who says I killed whitey?' Young felt that this utterance was significant because he had not yet told the defendant that the victim was Caucasian. Young testified that the defendant first stated that he could not remember where he had been on the night of the murder. Later, the defendant told Young that he had been with his girlfriend all day and night. Finally, he told Young that he had been mistaken and that he had worked on the day in question.

"The State also called Sergeant Ron Brown of the Topeka Police Department. Brown testified that he assisted the Lawrence police in apprehending the defendant.

9

Brown stated that when the defendant was first arrested, the defendant stated, 'What do you guys got me for? What? Did I rob someone? What? Did I kill someone?'

"During jury deliberations, the jury sent a note to the court asking for a read back of the testimony of 'Detective Young . . . or, ?' regarding the presentation of the photographic lineup to Slater. During an earlier question from the jury, the defendant was not present when the reply was being discussed. However, the defendant's attorney agreed that the defendant's presence was not necessary. Likewise, the defendant was not present when the answer to this jury question was discussed. The court called the jury in, and Young's testimony was read to the jury. The court then asked the jury if there was any other testimony that it wished to have read back. The jury indicated that it did not wish a further read back.

"The defendant was found guilty of felony first-degree murder, conspiracy to possess with intent to sell hallucinogenic drugs, and aggravated robbery. He was sentenced to a controlling term of life plus 58 months in prison." *State v. Edwards*, 264 Kan. 177, 180-88, 955 P.2d 1276 (1998).

In 2011, Edwards filed a motion for DNA testing. The district court granted Edwards' motion in 2013 and ordered the KBI to conduct DNA tests on a blood sample taken from the crime scene, the shirts and sweatpants Smart wore during the attack, a sexual assault kit conducted on Smart, a silver tray with marijuana roaches found at the crime scene, a jewelry box with marijuana roaches found at the crime scene, and a broken watch found at the crime scene.

The KBI concluded that DNA on one roach was "a mixture of DNA from at least two people" and "not consistent" with Edwards. The DNA from Smart's fingernail scrapings was also "not consistent" with Edwards. With respect to the tray, box, watch, remaining roaches, swabs from the left leg of Smart's pants, and swabs from the back and sleeve of Smart's shirt, the KBI found the samples contained "mixed DNA profiles [that] contain insufficient genetic information for comparison. Therefore, no conclusions can be

10

made regarding these items." Swabs from the right leg of Smart's pants, as well as swabs from the front and other sleeve of Smart's shirt contained

> "a mixture of DNA from at least three people and can be separated into a partial major profile and partial minor profiles. The partial major DNA profile . . . is not consistent with . . . [Edwards]. The partial minor DNA profiles . . . contain insufficient genetic information for comparison; therefore, no conclusions can be made regarding the partial minor DNA profiles."

Edwards then moved for additional, independent DNA analysis of the evidence, which was granted. Genetic Technologies, Incorporated, used the KBI's data to reach its own conclusions about the presence of Edwards' DNA in the samples.

In 2017, the district court held an evidentiary hearing on the results of the DNA testing. Jami Harmon, the director of Genetic Technologies, testified that her company used "probabilistic genotyping" to interpret the KBI's raw data and draw conclusions about whether Edwards' DNA was present in the given samples.

Harmon explained that forensic laboratories, including the KBI, establish concentration thresholds that samples must meet in order to be considered testable. The KBI uses a threshold of "60 relative florescent units." Scientists count the number of alleles at separate locations, called "loci," in the DNA to ascertain the number of individuals represented in a sample. Then, scientists determine the "combined probability of inclusion" ("CPI") or "combined probability of exclusion" ("CPE"). Harmon testified that the use of CPI or CPE "doesn't take into consideration the potential for what we call allelic dropout or dropin during the entire testing process." She said that the use of a high threshold and the CPE and CPI methods "resulted in . . . [scientists] losing the ability to make statements about very useful DNA." Instead, she said, her lab uses "probabilistic genotyping." Probabilistic genotyping

11

"looks at what we call the baseline voids and then goes two standard deviations above that. And then draws a line so that we can incorporate much more of the data than has been previously incorporated. And we can do that one for above the limited detection, and because we are, in fact, addressing mathematically allelic dropout and allelic dropin issues."

Probabilistic genotyping "is used to include individuals to sample that have otherwise been rendered uninterpretable or insufficient for comparison. And likewise, this may exclude individuals from samples that have been otherwise rendered for uninterpreting or not used for comparison purposes," she said.

Using probabilistic genotyping, Genetic Technologies concluded that Edwards was "effectively excluded" as a DNA contributor to the tray, roaches, pants, and shirt. However, the box and the watch were "unsuitable even for probabilistic genotyping" because of allelic dropouts; Genetic Technologies thus drew no conclusions about those items.

On cross-examination, Harmon admitted that scientists are "not necessarily" certain to find DNA on a cigarette for each person who has smoked that cigarette. Whether an individual's DNA is present on a cigarette they smoked "depend[s] on how long a person had that cigarette in their mouth. Whether they were shedding skin cells effectively. How many times they handled that particular cigarette." In other words, excluding Edwards as a DNA contributor to the cigarettes did not necessarily mean he never touched the cigarettes.

Edwards urged the district court to set aside his conviction or grant him a new trial in light of the DNA test results. The district judge denied Edwards' motion. She concluded that "the failure to find Defendant's DNA on the tested objects is more favorable to the Defendant than a finding that proves his DNA was present at the scene of the crime . . . . To that extent, it is favorable." Nevertheless, she concluded that the new

12

DNA evidence was "not reasonably probable to lead to a jury reaching a different result." She reasoned that "the absence of evidence is not evidence of absence"; the DNA evidence "does not . . . actually provide evidence of his absence when the homicide occurred." She also noted that his trial defense explicitly pointed out the absence of physical evidence connecting him to the crime scene; nevertheless, the jury chose to convict.

Edwards appealed this decision, arguing the district judge abused her discretion by denying his motion for a new trial.

DISCUSSION

K.S.A. 2019 Supp. 21-2512 allows individuals serving a sentence for murder to seek DNA testing of previously untested physical evidence. What happens after DNA testing is performed depends on whether the test results are unfavorable or favorable to the defense. In this case, the district judge concluded that the DNA results were favorable to Edwards. This finding is not disputed on appeal.

The statute provides that:

"(f)(2) If the results of DNA testing conducted under this section are favorable to the petitioner and are of such materiality that a reasonable probability exists that the new evidence would result in a different outcome at a trial or sentencing, the court shall:

(A) Order a hearing, notwithstanding any provision of law that would bar such a hearing; and

(B) enter any order that serves the interests of justice, including, but not limited to, an order:

(i)     Vacating and setting aside the judgment;

13

(ii)     discharging the petitioner if the petitioner is in custody;

(iii)    resentencing the petitioner; or

(iv)     granting a new trial.

(3) If the results of DNA testing conducted under this section are inconclusive, the court may order a hearing to determine whether there is a substantial question of innocence. If the petitioner proves by a preponderance of the evidence that there is a substantial question of innocence, the court shall proceed as provided in subsection (f)(2)."

"[F]avorable testing alone does not mean the district court must grant a defendant affirmative relief." *State v. LaPointe*, 309 Kan. 299, 305, 434 P.3d 850 (2019). When, as here, a district judge concludes the DNA test results were favorable, he or she then considers whether to grant a new trial.

"The standard for whether to grant a new trial under such circumstances is similar to our standard for granting a new trial based upon newly discovered evidence, except that no time limit exists for such a motion and a defendant need not establish that the new evidence was newly discovered. In all other respects it is treated as a motion for new trial governed by the provisions of K.S.A. 22-3501: 'The court on motion of a defendant may grant a new trial to him if required in the interest of justice.'

"Just as the court '*shall enter any order that serves the interests of justice*' under the provisions of K.S.A. 2005 Supp. 21-2512, one such order 'in the interest of justice' is an order for a new trial. In order to grant such an order, the 'evidence must be of such materiality that a reasonable probability exists that it would result in a different outcome at trial. [Citation omitted.]'" *Haddock v. State*, 282 Kan. 475, 499, 146 P.3d 187 (2006).

14

A "reasonable probability" is "a probability sufficient to undermine the confidence of the outcome. [Citations omitted.]" *State v. Rodriguez*, 302 Kan. 85, 93, 350 P.3d 1083 (2015).

This court reviews a district judge's decision to deny relief under K.S.A. 2019 Supp. 21-2512(f)(2) for an abuse of discretion. *LaPointe*, 309 Kan. 299, Syl. ¶ 2. "A district court abuses its discretion when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial action is based on an error of fact." *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018). "The party asserting an abuse of discretion bears the burden of establishing such abuse." *State v. Darrah*, 309 Kan. 1222, 1227, 442 P.3d 1049 (2019).

In this particular case, we are concerned only with Edwards' allegation regarding the first type of abuse of discretion. We cannot reverse the district judge's denial of Edwards' motion for a new trial unless no reasonable person could agree with her conclusion that no reasonable probability existed that the DNA results would have resulted in a different outcome at the original trial. See *LaPointe*, 309 Kan. at 300.

Edwards argues that because his DNA was not identified in any of the tested samples, he "cannot be the shooter, and the district court erred when it did not, at a minimum, grant him a new trial." The State argues that, much as in *LaPointe*, the jury in Edwards' case already knew of the lack of physical evidence connecting him to the crime scene, but it convicted him anyway on the basis of eyewitness and coconspirator testimony.

In *LaPointe*, a jury convicted Jack LaPointe of aggravated robbery and aggravated assault arising from the armed robbery of a Payless shoe store. "A store clerk, customers, and others in a nearby parking lot provided general descriptions, but only one witness later identified LaPointe." 309 Kan. at 301. One eyewitness identified a person other than

LaPointe when shown a photo lineup. "Police found a plaid shirt and baseball hat at a breezeway in a nearby apartment complex. They discovered a pair of gloves in a different breezeway." 309 Kan. at 301. Police also found a bandana under a car in the complex parking lot. Head hairs were found on the clothing. At LaPointe's trial, a criminologist testified that the hairs "most likely did not belong to LaPointe" but there was a "'remote explanation' that LaPointe could still be the source." 309 Kan. at 301. Three fingerprints at the scene also did not match LaPointe.

A man named Michael Norton testified for the State, claiming he served as LaPointe's accomplice in the robbery, which LaPointe agreed to commit in part to pay a debt owed to Norton. Norton testified that LaPointe went into the Payless while Norton waited in a car in the complex lot. LaPointe wore blue jeans and a sweater and carried a baseball cap, bandana, and sawed-off shotgun. When LaPointe returned to the car, he carried a bag of money, the bandana, and the gloves. Norton told officers that LaPointe threw the gun on a roof; police later recovered the gun from the roof of a nearby store.

LaPointe testified, confirming he knew Norton and lost Norton's pistol, but he denied committing the robbery. LaPointe also claimed he gave a sawed-off shotgun to Norton.

LaPointe's wife provided him an alibi. She also confirmed that LaPointe lost a pistol belonging to Norton and obtained a sawed-off shotgun around the time of the robbery.

During closing, the State called the "scientific evidence" a "wash" and emphasized the eyewitness testimony. The defense "called the parking lot witness' testimony into question by pointing out inconsistencies with her companion's testimony and her brief opportunity to see the robber. Defense counsel also challenged Norton's credibility." 309 Kan. at 308. The defense also highlighted the contrary physical evidence:  the

16

fingerprints were not a match, and the hairs were "certainly not" LaPointe's. 309 Kan. at 308. The jury nevertheless convicted LaPointe.

Years later, a district judge granted LaPointe's request for postconviction DNA testing. Two hairs, one from the "cap/gloves" and the other from the bandana, were tested. The former "yielded test results that were inconclusive but more likely than not excluded LaPointe as the contributor." 309 Kan. at 303. The latter "produced test results conclusively excluding LaPointe as the source" but the district court judge denied LaPointe's request for a new trial.

> "The court found the results were favorable but insufficient to support a reasonable probability they would result in a different trial outcome. The court reasoned the jury convicted LaPointe when it was clear no physical evidence linked him to the robbery and that most likely he did not contribute the hairs. The court noted defense counsel emphasized both these points at trial. It also concluded the DNA results would have had little to no impact on the testimony from Norton and the eyewitnesses." 309 Kan. at 303.

On appeal, we affirmed the district judge's denial of LaPointe's motion for a new trial. We wrote:

> "The favorable test results affirmed the hair comparison expert's opinion that the hair was probably not LaPointe's. But they do not alter the expert's further testimony that the fact the hair did not belong to LaPointe did not mean he did not wear the clothing. The possibility raised by [the criminologist] remains that LaPointe might not have deposited hair on the clothing or that the State simply did not find any hairs he did shed. '[T]he presence of a reasonable explanation mitigates the potential impact of the evidence if there were a retrial, a consideration that can be made in making a probabilistic determination about what reasonable, properly instructed jurors would do.' [Citation omitted.]" *LaPointe*, 309 Kan. at 309.

17

In addition, we noted that the jury assessed Norton's credibility when reaching its verdict; Norton's testimony was corroborated in part by recovery of the gun, the eyewitness identification, and LaPointe's wife's confirmation of circumstantial details. 309 Kan. at 310.

This case is much like *LaPointe*. The non-DNA evidence against Edwards is strong.

Huggins testified as a coconspirator, providing his account of serving as the getaway driver. Both Heather and Slater, who were in the apartment, identified Edwards as the shooter. Edwards attempts to cast doubt on Heather's and Slater's identifications by pointing out that Slater admitted to drinking and smoking that day and that Heather's also had smoked marijuana before the shooting. But Heather also testified she saw the defendant earlier in the day when he came to the apartment before Smart returned with the marijuana. And the jury heard the testimony about Slater's and Heather's potential intoxication, apparently factored this into their credibility determination, and convicted Edwards anyway.

Moreover, Young's testimony that Edwards asked, "Who says I killed whitey?" despite Young not disclosing the victim's race, is influential, as is Brown's testimony that, upon arrest and without prompting, Edwards asked, "What? Did I rob someone? What? Did I kill someone?"

In a similar vein, the jury heard McAtee's testimony that Ostrander, Edwards' girlfriend, said that Edwards and his friend Clay "talked a lot about ripping people off for weed" and that on February 19, 1996, Edwards was out of town really late and claimed he "[j]acked them, them mother fuckers" meaning that he "screw[ed] over" someone and "st[ole] someone's weed."

18

Also as in *LaPointe*, during closing at Edwards' trial, the defense specifically highlighted the lack of physical evidence connecting Edwards to the crime scene. Defense counsel told the jury: "Let's go through the physical evidence they got that ties Mr. Edwards to this crime. They got nothing. Absolutely nothing." The jury convicted anyway—no doubt because of the abundance of other evidence, including the eyewitness testimony, Edwards' own incriminating statements, and McAtee's testimony that Ostrander said Edwards bragged on the day of the murder about ripping someone off for weed.

Finally, the defense may argue that there is a distinction between the jury hearing of the lack of physical evidence at the original trial, and the test results presented here which showed there was none of Edwards' DNA at the scene. We find this distinction does not matter under the applicable standard of review because of the considerable amount of nonphysical evidence placing Edwards at the scene.

In light of all of the above, the district judge did not abuse her discretion by concluding that there was no "reasonable probability" the DNA results would have changed the original trial's outcome.

CONCLUSION

We affirm the district judge's denial of Edwards' motion for a new trial.

WILSON, J., not participating.

MICHAEL E. WARD, Senior Judge, assigned.[1]

DAVID WILLIAM ROGERS, District Judge, assigned.[2]

---

[1]**REPORTER'S NOTE:**  Senior Judge Ward was appointed to hear case No. 120,600 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

[2]**REPORTER'S NOTE:**  District Judge Rogers was appointed to hear case No. 120,600 vice Justice Wilson under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.